(No. 31388.

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN W. EATMAN, Plaintiff in Error.

*Opinion filed March 22, 1950.*

AARON H. PAYNE, of Chicago, (JAMES Y. CARTER, and JULIAN B. WILKINS, of counsel,) for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN S. BOYLE, State's Attorney, of Chicago, (JOHN T. GALLAGHER, and RUDOLPH L. JANEGA, both of Chicago, of counsel,) for the People.

Mr. JUSTICE GUNN delivered the opinion of the court:

Plaintiff in error, John W. Eatman, was indicted in the criminal court of Cook County for manslaughter. He was tried before the court without a jury, found guilty, and sentenced to ten years' imprisonment in the penitentiary. He prosecutes a writ of error.

Defendant, with his wife, occupied the south front apartment on the second floor of an apartment building at No. 1244 South Troy Street, in Chicago. Adjoining this apartment was another, designated as the north front apartment. A public hallway ran north and south along these two apartments. A short vestibule hall opened from the main hall, about seven feet in length, between these two apartments, and at the end of this vestibule was a bathroom for the common use of both of the apartments. The entrance to each apartment was a door from this vestibule, and the vestibule itself was closed off from the main hall by a door, which rendered it accessible only to the residents of the apartments, or to persons delivering goods to them, since the only entrance to the apartments was through the doors from the vestibule.

The apartment was rented by the week, and on April 29, 1949, the defendant paid his rent in advance to May 6, and at that time told his landlady, a Mrs. Miller, he had been out of work for a week and would pay her for two weeks the following Friday. Sometime on May 7, Mrs. Miller turned off the electric current, so the defendant had no light or other electric service. About seven o'clock of the evening of May 9, Mrs. Miller, accompanied by the deceased, Guy Luke, whom she described as a friend who lived with her, opened the door to the vestibule with a key, and knocked at the inner door of the Eatman apartment. Mrs. Miller had a flashlight in her hand, and when the door was opened she demanded her rent, and a verbal controversy ensued, regarding which the testimony is conflicting.

Mrs. Miller testified that she and Guy Luke went to the apartment of the defendant and opened the vestibule door with a key, and knocked at the door of the defendant; that someone inside said "Who is there," and she said "It is Mrs. Miller, Mr. Eatman," and defendant opened the door and Mrs. Miller said "What about the rent," and Mrs. Eatman replied and said "I told you he would have your rent on Friday, he would pay you a couple on Friday," and Mrs. Miller said "No;" and further testified "I told Mr. Eatman that I would have to have the rent, so I said to him, I have to have the rent, and Mr. Eatman interrupted me, and said when you come here do you have to have a bodyguard, and he was coming by me to where Mr. Luke stood;" and Mrs. Miller said "Who are you to tell me who I am to take with me." Further discussion occurred about the payment of the rent which had been paid up to May 6. Mrs. Miller then claims that Eatman slammed the door shut, and broke the skin on her hand, and that then Mr. Eatman opened the door again and rushed out and stabbed Luke.

The testimony of both Mr. and Mrs. Eatman is substantially the same up to the point as to what occurred

after the door was shut. Mrs. Eatman says that when her husband asked Mrs. Miller if it was necessary to have a bodyguard to collect rent, and asked her why she did not come in and talk like a lady, Mrs. Miller said "It is none of your business who I bring up here with me. Unless you pay the money I will take your apartment, that is none of your business," and that after that Mr. Eatman attempted to close the door, and Mrs. Miller set her foot in the door so it could not be closed, and she said: "All right, you will pay for this, you smashed my finger, you are going to go to jail for this," and Mrs. Miller said "Come, Luke, come here, let's get him," and that Mrs. Miller and Luke lunged against the kitchen door, and when they broke in Mrs. Miller beat her husband over the head with the flashlight, and Luke said "I will kill the s— b—," and that he had her husband by the collar and was striking him when the latter reached up to the top of the refrigerator, which was near the kitchen door, and took down a knife and stabbed Luke, from which Luke staggered back and fell to the floor.

The testimony of Mr. Eatman is substantially the same. And, in addition thereto, seven witnesses testified that the defendant had a good reputation as a peaceable and law-abiding citizen, and for over twenty years of his life had been a minister of the Gospel.

From the foregoing it appears that the only substantial dispute in facts is in what part of the defendant's apartment the homicide occurred, Mrs. Miller claiming the defendant advanced from his kitchen door to the vestibule door, and assaulted Luke without provocation. Eatman and wife both claim that Mrs. Miller and Luke were trying to get into the kitchen, and had actually broken into the same and were assaulting Eatman, and that the killing took place while repelling them. Circumstances strongly support the latter theory. In the first place, the body of Luke was found lying in the doorway of the kitchen, the head and trunk being inside, and the balance of the body in the

vestibule; (2) the flashlight belonging to Mrs. Miller, with the electric cells loose, was found lying in the kitchen, as also was the knife which was used in the killing; (3) all agree that Mrs. Miller tried to enter the apartment after Eatman told her he could not pay her, and even Mrs. Miller agrees that she threatened to send him to jail for trying to close the door, and pinching her hand; (4) the presence of Luke is unexplained except on the theory that Mrs. Miller expected action, in which she would need assistance; and (5) Mrs. Miller had previously cut off the electric current, which indicated her feelings were not hospitable, to say the least.

These admitted facts make the claim of Mrs. Miller that the defendant rushed through the kitchen door and to the vestibule door, and stabbed the deceased, very doubtful. She claims the defendant closed the door in her face, and then again opened it and charged past her to reach Luke. The query naturally arises, why would a man trying to eject one from his premises, and ending a dispute with an angry woman, then reopen the door and rush out again after he had succeeded in closing the door?

There is another circumstance impeaching Mrs. Miller and supporting the defendant, and that is that both he and Mrs. Eatman claim she struck him on the head with the flashlight. The fact that the flashlight, with the loose cells, was found lying on the floor in the kitchen afterwards by the police indicates strongly that something of a violent nature had occurred to detach the cells from the flashlight. But, regardless of the exact place in the apartment where the homicide occurred, it clearly appears that both Mrs. Miller and Luke were trespassers in the defendant's habitation, and there for the purpose, as Mrs. Miller in her own testimony says, "If you can't keep the rent up, why don't you let someone else,—give the apartment up, let someone else have it who can pay the rent?" Since all of the witnesses agree that Mrs. Eatman told her that he did not

have the money at that time, and would pay for that week and another week on Friday, it is perfectly clear that since she could not get money at once Mrs. Miller wanted the apartment.

Possession of rented premises cannot be lawfully obtained in this manner, and the right of a person to commit homicide in defense of his habitation is justified by the statute, which provides: "Justifiable homicide is the killing of a human being in necessary * * * defense of habitation, property or person, * * * against any person or persons who manifestly intend and endeavor, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein." (Ill. Rev. Stat. 1949, chap. 38, sec. 148, par. 366.) Section 155 places the burden of proof upon the defendant to show circumstances of mitigation or justification where the killing is proved, "unless the proof on the part of the prosecution sufficiently manifests that the crime committed only amounts to manslaughter, or that the accused was justified or excused in committing the homicide." .

It hardly needs more than an application of the statute to the admitted facts in this case to disclose the conviction of the defendant was erroneous. Here, the defendant and his wife were peaceably eating their evening meal, in their own habitation, before it became dark, because the landlady had cut off the electric current. Their kitchen door was closed and the vestibule door was locked. Mrs. Miller and her male companion came to the vestibule door, unlocked it, and entered a part of the defendant's premises, and knocking on the entrance door to the kitchen immediately commenced a violent quarrel. Mrs. Miller admitted to pushing inside the kitchen door, and being pushed back; deceased came to her aid, and in the resulting fight he was killed. It makes little difference if the fatal blow was struck inside the kitchen or outside in the vestibule, as

both were the premises of the defendant. The aggressor throughout was Mrs. Miller, who cut off the current, leaving the defendant without light or refrigeration, who demanded immediate possession, whose actions and threats indicated she intended to take possession by force with the aid of the deceased, and whose manifest ill-will and aggressive attitude causes us to consider her testimony with considerable skepticism and requires proof upon the part of the prosecution to show that some lawful warrant existed for the actions of both Mrs. Miller and the deceased, Guy Luke.

This all appears without reference to the testimony of the defendant and his wife, who both testified that Mrs. Miller and Luke came forcibly inside their kitchen, and were assaulting the defendant, the woman with a flashlight and Luke by catching him by the throat, and to protect himself defendant reached upon the top of the refrigerator and took down the knife with which he slew one of the intruders. In *Reins* v. *People,* 30 Ill. 256, the deceased was killed while trying to break open the door of the house where the defendant lived. The judgment was reversed because the court refused to give the following instruction: "If the jury believe, from the evidence, that the defendant Reins, in defense of himself, inflicted upon the deceased the wounds or stabs which caused his death, while the deceased was manifestly intending and endeavoring in a violent manner, to enter the habitation of the witness, Mrs. Foley, for the purpose of assaulting or offering personal violence to the defendant Reins, being therein, the killing was justifiable, and the jury must acquit the defendant." The court commented that this instruction was undoubtedly the law.

*Hayner* v. *People,* 213 Ill. 142, is another case applying the law of homicide in defense of habitation. The court points out that the right of defense of habitation has been settled by statute. It does not require danger to life or great bodily harm in order to invoke the right to kill, and

in reversing the judgment the court comments: "A man in his own habitation may resist force with force, and oppose an unlawful entry against his will by one who in a violent manner attempts to enter with a purpose of assaulting or offering violence to him, even to the extent of taking life, although the circumstances may not be such as to justify a belief that there was actual peril of life or great bodily harm." And in the case of *People* v. *Willy*, 301 Ill. 307, we adhered to the holding in the *Hayner case* by adopting the exact language we have quoted above from that case.

As a matter of history, the defense of habitation has been the most favored branch of self-defense from the earliest times. Lord Coke, in his Commentaries, says: "A man's house is his castle—for where shall a man be safe if it be not in his house?" (3 Institute, 162.) And in the Pandects, long before Coke, it is stated "One's home is the safest refuge for every one." Coke's statement is directly held to be the law of Illinois in *Davison* v. *People*, 90 Ill. 221. The decisions of our court, and indeed our statute, are but a restatement of the ancient law of England, which became the law of this country in 1607. As a matter of fact the statute in its present form has been little changed since 1827, when it was first enacted.

It may seem somewhat unusual that decisions construing this particular section of the statute are so few in number, but, upon reflection, we can also understand how unusual it is to procure a conviction for the killing of a person entering another's habitation with hostile or angry intent. We think it may be safely laid down to be the law of this State that a man's habitation is one place where he may rest secure in the knowledge that he will not be disturbed by persons coming within, without proper invitation or warrant, and that he may use all of the force apparently necessary to repel any invasion of his home.

The facts in the present case disclose that the defendant had a good reputation as a peaceable and law-abiding citizen.

No attempt is made upon the part of the prosecution to prove otherwise. From the testimony of the witnesses it appears that the defendant had never been in trouble before. The testimony of himself and wife establishes a complete case, not only of defense of habitation, but also a defense of self, and it is difficult for us to understand how the trial court reached the conclusion that it did from the evidence. As a matter of fact, there is not a single authority cited by the People that refutes in any way the law as it is declared in these several cases and in the statute, and in reality the only ground upon which the People claim an affirmance is that the reviewing court will not disturb the verdict of the trial court where the crime is established by clear and convincing evidence. We agree with the statement of the law, but we do not agree with the assumption that the crime of manslaughter has been proved by clear and convincing evidence.

The indictment for manslaughter in itself discloses that the grand jury did not fully believe the testimony of Mrs. Miller, for, if her testimony is true, the offense was murder and not manslaughter. The trial was based upon an indictment charging killing without malice. One may well ask what a person in the peaceful occupation of his habitation is to do when another person, either with the intent to oust him from his own, or to commit violence to his person, breaks in, if he must measure the quantity of force he may use in repelling the attack, or risk punishment in the penitentiary for manslaughter. We have held that while evidence of good reputation is not proof of innocence, it may not be disregarded, and it may be sufficient to raise a reasonable doubt of the defendant's guilt. (*People* v. *Grove,* 356 Ill. 246; *People* v. *Buchholz,* 363 Ill. 270.) Such good reputation is present in this case, and, moreover, the other testimony does not convince us beyond a reasonable doubt that the defendant did not commit the homicide in defense of his habitation.

It is the rule in criminal cases that this court will examine the record, and if we have a reasonable doubt of the defendant's guilt it is our duty to set aside the conviction. It seems to us as though the trial court must have considered the case as though the affray took place on neutral ground instead of defendant's habitation, which the law gives him the right to protect, even to the extent of taking life.

There are other errors assigned for reversal which have some merit, but they are not discussed because of the failure of the evidence to show beyond a reasonable doubt that the defendant is guilty of manslaughter.

The judgment of the criminal court of Cook County is reversed.

*Judgment reversed.*