THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AARON MORRIS, Defendant-Appellant.

First District (5th Division)   No. 83—914

Opinion filed October 16, 1987.

LORENZ, J., specially concurring.

Steven Clark and Donna Finch, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Maureen A. Harton, and William F. Dorner, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

Defendant, Aaron Morris, was tried on two counts of murder and one count of armed violence. His defense was self-defense and defense of his dwelling. The jury returned a verdict finding Morris guilty of voluntary manslaughter and the court sentenced him to 10 years' imprisonment. On appeal, Morris contends (1) the trial court erred when it sustained the prosecutor's objections to questions he was asked about his state of mind when he shot the deceased; (2) the evidence did not prove him guilty of voluntary manslaughter beyond a reasonable doubt; (3) the trial court erred in refusing to give a jury instruction on defense of a dwelling; and (4) the trial court abused its discretion in sentencing Morris to 10 years' imprisonment. We reverse and remand.

Defendant shot and killed Bobby Thomas in the vestibule of the building in which defendant lived. Thomas had returned and entered the vestibule after a fight between him and the defendant in front of defendant's building had been broken up by Thomas' friends, who took Thomas away. The events which precipitated the shooting are as follows.

Bobby Thomas and his friend Richard Adams were arguing on the corner of 57th and Laflin Streets in Chicago. They had been drinking whiskey and beer for several hours. Thomas and Adams left the corner and continued to argue. While still arguing loudly they stopped in front of the apartment building where the defendant lived with his sister. Defendant heard the loud argument and profane language of Thomas and Adams and he saw them in front of his residence. The defendant testified, "I walked over to them [Thomas and Adams] and I asked them, I said, 'Would you all keep your noise down or the landlord will call the police.'" Thomas cursed the defendant. Defendant testified that he turned to walk away. Thomas said, "[D]on't turn your back on me," and, as defendant walked away, Thomas said, "I will kill you." Defendant testified he turned around and told Thomas that he

was not going to do anything to him and to "go about your business." He testified:

"A. At this time, while I was facing him, he [Thomas] said, 'You got something, man?' I said I got some food stamps and I showed them to him, and I turned around and faced my sister and then he struck me from behind and my forehead hit the door.

Q. When he struck you from behind, tell the ladies and gentlemen of the jury how he struck you.

A. He pushed me with force (indicating).

Q. What did you do then?

A. I again turned around and got to fighting.

Q. Did you hit Thomas?

A. Yes.

Q. Did he hit you?

A. Yes.

Q. How many times did you hit Bobby Thomas?

A. Several times.

Q. Can you describe for the ladies and gentlemen of the jury how you were hitting Bobby Thomas at this point?

A. Like this. Then I had grabbed him by the hair, and then I just start[ed] hitting him (indicating).

\* \* \*

Q. Approximately how long did this fight last?

A. No more than a couple minutes.

\* \* \*

Then some guys, they broke the fight up."

Defendant won the fight. Thomas' face was beaten and his nose and mouth were bleeding. Defendant went back inside his apartment building. With the help of his three friends, Thomas was taken home, where he went to the washroom and looked at his face in the mirror. Angelo Caldwell, a State's witness who went with Thomas to his home after the fight, testified that he was standing in front of the washroom door in Thomas' house. Caldwell testified:

"Q. What did you see within the washroom?

A. Bobby was looking at his face in the mirror.

Q. After he did that, what happened then?

A. He turned around and went straight out the back door.

Q. Did you do anything when Bobby Thomas went out of the back door of the house?

A. Yes, I went behind him.

Q. You, in fact, left his house?

A. Yes.

Q. Where did you go? ***

A. When I went out behind Bobby Thomas, he was out of my sight some, but I did."

Another State's witness, Richard Williams, testified that he also went with Thomas to his home after the fight and that when Thomas looked in the mirror, Thomas commented that defendant had injured his face. Williams testified that Thomas left his home and returned to defendant's apartment building, entered the vestibule and fired his gun in the direction of the stairway. Williams heard defendant's sister yell from inside the apartment building, "Don't shoot me, don't kill me." Defendant fled out of the building.

Dorian Gray, a defense witness, testified that he saw Thomas and Adams arguing and that Thomas was drunk and was very loud. Gray testified that Thomas cursed the defendant, the defendant turned his back and that Thomas pushed him. Thomas and the defendant began fighting, Thomas fell, and the defendant swung at Thomas four or five times. Gray testified that later, when he was approximately 10 to 15 feet away from the vestibule of defendant's apartment building, he could see the defendant and the defendant's sister. Gray heard gunshots come from defendant's apartment building and saw one or two flashes. Gray stated that the defendant ran out of the building, followed by Thomas, who was shooting at him. Gray testified that as defendant ran down the street, he fired his gun at Thomas. Gray ran to telephone the police. When he returned, he saw Thomas lying on the ground.

Defendant testified that after his fight with Thomas he went inside his apartment building. While he was in the vestibule behind a door, someone came in. Defendant heard people say, "He's got a gun, he's got a gun," and he heard his sister yell, "Don't shoot me, don't shoot me." Defendant saw his sister fall. He testified that after Thomas fired his gun and looked up the stairs at him, Thomas pointed his gun upward and fired. Thomas aimed the gun at defendant. Before Thomas fired his gun again, defendant fired his gun. Defendant testified that Thomas did not fall. Defendant ran out the front door of the apartment building, and, when he was on the street, Thomas started shooting at him. Defendant testified, "I ran across the street, and I just shot back ***. *** I ran and then I just threw the gun."

■ We agree with the defendant's contention that the trial court erred when it sustained the State's objections to questions to the defendant about his state of mind at the time he shot Thomas. Our supreme court stated in *People v. Biella* (1940), 374 Ill. 87, 89, 28

N.E.2d 111:

"The circumstances under which [an] act in question was done usually serve to manifest to a great degree the intent of the actor and may overcome his declaration as to his intention, but he has the right to testify to his intention and to have the circumstances surrounding the act considered in connection with his testimony."

In the case at bar, the trial court sustained the State's objections to such questions put to defendant by his attorney on direct examination, as follows:

"Q. And what did this individual [John, defendant's friend] do?

A. He gave me a gun.

Q. Why did you take this gun?

[Assistant State's Attorney]: Objection.

THE COURT: Sustained.

[Defense Attorney]: Your Honor, it goes to the state of mind.

THE COURT: The objection was sustained. Next question.

* * *

[Defendant]: Bobby Thomas [the deceased] he came in and he fired and he said, where you at, where you at, and he looked up the stairs upwards and then he looked over and he seen me. Then he aimed the gun at me.

Q. What did you think that he was going to do at that point?

[Assistant State's Attorney]: Objection, Judge.

THE COURT: Sustained.

* * *

Q. Now, Aaron, at the time that Bobby Thomas came into that vestibule area, were you afraid?

A. Yes.

[Assistant State's Attorney]: Objection.

THE COURT: Objection sustained. The question is leading and suggestive.

Q. What did you think Bobby Thomas was going to do at the time that he came into that vestibule?

A. Kill me.

[Assistant State's Attorney]: Objection.

THE COURT: Objection sustained. The question is leading and suggestive.

Q. What did you think Bobby Thomas was going to do at

the time that he came into that vestibule?

A. Kill me.

[Assistant State's Attorney]: Objection.

THE COURT: Sustained. Question and answer will be stricken.

Q. If I may have one moment. If I may be heard on the sidebar?

THE COURT: Not at this time."

In *People v. Johnson* (1969), 108 Ill. App. 2d 150, 158, 247 N.E.2d 10, the appellate court reversed the defendant's murder conviction because the State's objections were sustained as to the defense counsel's questions to the defendant about his mental state during his altercation with the deceased. The questions defense counsel asked the defendant at trial were as follows:

"THE DEFENDANT (continuing): When I pulled out my knife Ed Merchant [the deceased] was coming toward me.

Q. What did you think he was coming toward you for? (State's objection sustained.)

Q. Did you feel, sir, that you were about to be attacked? (State's objection sustained.)

Q. Would you tell the ladies and gentlemen of the jury your mental state at that time? (State's objection sustained.)" 108 Ill. App. 2d 150, 158, 247 N.E.2d 10.

■ The appellate court in *Johnson* ruled that defense counsel's questions related to the crucial issue in the case, namely, the defendant's motive or belief at the time the deceased rushed toward him with a weapon, and that defendant was erroneously denied the opportunity to directly testify to his intention, motive and belief. In the case before us, it was reversible error for the trial court to sustain the State's objections to defense counsel's questions to defendant, which thereby prevented defendant from testifying about his intention, motive and belief concerning a crucial issue in this case. Defendant was erroneously denied this opportunity to so testify. The court should have permitted the defendant to answer the questions.

The State contends the question defendant was asked on direct examination, "Why did you take this gun?" was irrelevant because defendant had not testified that he feared Thomas. The State further contends that the question to the defendant, "What did you think Bobby Thomas was going to do at the time he came into the vestibule?" was improper because it called for the defendant to speculate on Thomas' state of mind or intent. We disagree. These questions asked the defendant what *he* thought Thomas was going to do when

Thomas entered the vestibule, not what *Thomas* thought Thomas was going to do when Thomas entered the vestibule. The test of self-defense is what the defendant, as a reasonable man, believed under the circumstances. (People v. White (1980), 87 Ill. App. 3d 321, 323, 409 N.E.2d 73.) Section 7—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 7—1), provides:

"Use of force in defense of person.

A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

The defendant urges that under the provision of this statute, he was legally justified in his use of force against Thomas. The evidence established that after the fight between the defendant and Thomas, which was created by Thomas and in which Thomas was beaten, Thomas went home with his friends. While there, Thomas saw how badly he had been beaten. Thomas left his home, returned to and entered the vestibule of defendant's apartment building. The defendant's sister was heard to scream, "Don't shoot me, don't kill me." It is highly unlikely that Thomas, who was unable to successfully defend himself with his fists, who had just been beaten by the defendant, who had to be helped to his home by his friends, who observed the severity of his beating in his mirror, would then embark on a mission of revenge to the defendant's home *unarmed*. To do so unarmed would mean that Thomas would only get another beating by the defendant. It is reasonable to assume that Thomas got his gun while in his home and returned to harm the defendant. It certainly would have been reasonable for the defendant to have believed that, particularly upon hearing his sister's pleading screams. The State's contention that defendant's sister was pleading with the defendant, her brother, and not Thomas, "Don't shoot me, don't kill me," is ludicrous. It is obvious that she was pleading with Thomas. There was no evidence of any friction between the defendant and his sister. Richard Williams, a State's witness and a friend of Thomas', testified that Thomas returned to and entered the vestibule of defendant's building and fired his gun. Angelo Caldwell, a State's witness, testified he saw Thomas enter defendant's apartment building and that he heard gunshots come from the building. The State argues that the police did not

recover a gun from the scene or from the body of Bobby Thomas. The scene was not protected from the crowd, which included Thomas' friends, before the police arrived. This could explain the disappearance of Thomas' gun.

The jury, on the issue of self-defense, found against the defendant and found the defendant guilty of voluntary manslaughter. The defendant persuasively argues that the jury did so because it was erroneously precluded from hearing, and he was erroneously prohibited from presenting, his testimony of his belief, intent and state of mind at the time he shot Thomas. The trial court committed reversible error when it excluded this testimony.

■ The next issue defendant argues is that the evidence failed to prove his guilt of voluntary manslaughter beyond a reasonable doubt. We will not disturb the jury's verdict based upon the evidence presented. Voluntary manslaughter is defined in section 9—2(b) of the Criminal Code of 1961 as follows:

> "A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable."

Ill. Rev. Stat. 1985, ch. 38, par. 9—2(b).

Although it is not established by the evidence which of the defendant's shots actually killed Thomas, the jury could have concluded that when the defendant shot at Thomas from across the street while the defendant was fleeing, the defendant believed the circumstances to be such that would justify or exonerate the killing under self-defense, but that the defendant's belief was unreasonable. See *People v. McCoy* (1986), 140 Ill. App. 3d 868, 489 N.E.2d 477; *People v. Williams* (1985), 134 Ill. App. 3d 334, 480 N.E.2d 205.

■ Defendant next contends that the trial court erred when it refused to instruct the jury on the use of force in defense of a dwelling. Section 7—2 of the Criminal Code of 1961, entitled, "Use of force in defense of dwelling," provides:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's unlawful entry into or attack upon a dwelling. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if:
>
> (a) The entry is made or attempted in a violent, riotous, or tumultuous manner, and he reasonably believes that such force

is necessary to prevent an assault upon, or offer of personal violence to, him or another then in the dwelling, or

(b) He reasonably believes that such force is necessary to prevent the commission of a felony in the dwelling." Ill. Rev. Stat. 1985, ch. 38, par. 7—2.

Illinois Pattern Jury Instructions, Criminal, No. 24—25.07 (2d ed. 1981), entitled, "Use of Force in Defense of Dwelling," reads:

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to prevent another's unlawful entry into a dwelling.

However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if

(1) the entry is made or attempted in a violent, riotous or tumultuous manner and he reasonably believes that such force is necessary to prevent an assault upon himself or another then in the dwelling; or

(2) he reasonably believes that such force is necessary to prevent the commission of a felony in the dwelling."

At the jury instruction conference, the following occurred:

"[Assistant State's Attorney]: Judge, as to [IPI] 24-25.07, I object. This has nothing to do with any issue in the case ***. Seems to me, Judge, no matter how anyone views or interprets the evidence in this case, there is no issue of defense of dwelling.

THE COURT: *It has nothing to do with the defense of dwelling.* It has to do only with an effort to enter a particular dwelling.

[Defense Attorney]: [A]t that time of the shooting, Bobby Thomas entered that vestibule area. I would state that although it may not be specifically the actual physical dwelling of Aaron Morris. I certainly would submit to your Honor that an entryway that leads up to an apartment where Aaron Morris goes in, surely would meet within the theory of the defense of one's dwelling. That is a situation that we have.

THE COURT: *It is completely outside the issues of this case.* There is no such issue in this case and the instruction[s] address themselves to the issues, and this instruction would only apply if there was an issue in the case that a dwelling was being defended, so this will not be given." (Emphasis added.)

The trial court apparently believed that the defense of dwelling instruction should only be given if the dwelling itself was under siege. This interpretation was in error. The theory of using deadly force to

protect one's dwelling is not for the protection of the physical dwelling itself; rather, it is for the protection of the individuals therein. (*People v. Stombaugh* (1972), 52 Ill. 2d 130, 135, 284 N.E.2d 640.) In *Stombaugh*, our supreme court reversed the defendant's murder conviction and stated that he was entitled to an instruction on defense of a dwelling as well as self-defense. The court stated:

> " 'We think it may be safely laid down to be the law of this State that a man's habitation is one place where he may rest secure in the knowledge that he will not be disturbed by persons coming within, without proper invitation or warrant, and that he may use all of the force apparently necessary to repel any invasion of his home.' " 52 Ill. 2d 130, 137-38, 284 N.E.2d 640, citing *People v. Eatman* (1950), 405 Ill. 492, 498, 92 N.E.2d 387.

In the case at bar, the evidence established that defendant was inside the building where he and his sister lived when Thomas entered. The evidence further showed that Thomas' entry into defendant's building was violent. State's witness Angelo Caldwell testified that when Thomas entered the vestibule of defendant's building he heard defendant's sister yell, "Don't shoot me, don't kill me." State's witness Richard Williams testified that Thomas returned to and entered the vestibule of the defendant's residence and fired his gun toward the stairway. Defense witness Dorian Gray and defendant both testified that Thomas pushed defendant's sister to the ground when he entered the building. If defendant had a reasonable belief that force was necessary to prevent an assault upon himself or another within the dwelling, he had the right to use deadly force. Contrary to the State's assertion that a defense of a dwelling instruction should only be given if the defendant was attempting to protect his apartment, the rule here is that a defendant need only be within the confines *of his dwelling* to raise the issue of self-defense. *People v. Eatman* (1950), 405 Ill. 491, 91 N.E.2d 387.

■ The question of whether defendant's belief was reasonable and whether the fatal gunshot which struck Thomas came from inside or from outside the apartment building was a question for the jury. The evidence here was contradictory. State's witness Angelo Caldwell testified that after he heard gunshots in defendant's apartment building, he saw Thomas come out of the door "bent over." Defendant testified that after Thomas fired once in the apartment building defendant returned the fire, but that Thomas did not fall, and that defendant pushed past him and ran out of the building. Thomas followed him out of the building and started shooting. Defendant turned

and fired at Thomas. The State contends that the gunshot which killed Thomas was fired from outside defendant's apartment building. Defendant's testimony indicates that the fatal shot could have been fired from inside the building. This question of fact as to where the shot originated, or the significance, if any, thereof, should have been resolved by the jury on proper instructions. Absent a defense of dwelling instruction, the jury lacked the proper legal guidance to analyze fully the evidence and reach a verdict based on those facts. (See *People v. Pietryzk* (1987), 153 Ill. App. 3d 428, 435, 505 N.E.2d 1228.) Defendant was entitled to have the jury properly instructed. Because the jury was not properly instructed, the defendant's conviction for voluntary manslaughter must be reversed and the cause remanded for a new trial. In view of this ruling, we feel it is unnecessary to address defendant's final contention, that the trial court abused its discretion in sentencing him to 10 years' imprisonment.

Reversed and remanded.

SULLIVAN, P.J., concurs.

JUSTICE LORENZ, specially concurring:

While I agree with the majority in finding that this cause must be reversed and remanded, I do not agree with the reasoning behind the conclusion that the instruction regarding defendant's defense of his dwelling should be submitted to the jury. The majority summarily concludes that the vestibule within defendant's building is a dwelling so as to justify the submission of the defense of a dwelling instruction. The majority states "a defendant need only be within the confines *of his dwelling* to raise the issue of self-defense," citing *People v. Eatman* (1950), 405 Ill. 491, 91 N.E.2d 387. (Emphasis in original.) 162 Ill. App. 3d at 1055.

In *Eatman*, defendant, with his wife, lived in the south front apartment on the second floor of an apartment building. This apartment was adjoined to another by a public hallway that ran north and south. A short vestibule hall opened from the main hall, about seven feet in length, between these two apartments, and at the end of this vestibule was a bathroom for the common use of both of the apartments. The entrance to each apartment was a door from this vestibule, and the vestibule itself was closed off from the main hall by a door, which rendered it accessible only to the residents of the apartments. The court held that this vestibule constituted part of the dwelling.

*Eatman* does not support the contention that all vestibules constitute part of the dwelling. As a matter of fact, the reasoning of *Eatman* implies that it was the specific nature of this vestibule, inaccessibility to the public, that rendered it a dwelling. Consequently, I am not willing to state in conclusory fashion, as does the majority, that this shooting occurred in defendant's dwelling. *Eatman* does not stand for that proposition.

Dwelling is defined as:

> "[A] building or portion thereof *** which is used or intended for use as a human habitation, home or residence." (Ill. Rev. Stat. 1985, ch. 38, par. 2—6.)

Here, there is evidence to suggest that the victim fired a shot while in the vestibule in the direction of defendant's apartment. Defendant heard his sister yell, "Don't shoot me." There is evidence that the victim was then shot while in the vestibule by defendant. During closing argument the prosecution even asserts that the victim was "hunched over" when leaving the building. Under these facts, the jury was entitled to an instruction regarding the defense of his dwelling. See *People v. Stombaugh* (1972), 52 Ill. 2d 130, 284 N.E.2d 640.

Consequently, I agree with the majority than an instruction on defense of dwelling was required. However, I disagree with the majority's reasoning in reaching that conclusion.