NO. 4-09-0454          Filed 2/8/11

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| MICHAEL B. BROWN, | ) | No. 08CF181 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Robert L. Freitag, |
| | ) | Judge Presiding. |

_____

JUSTICE POPE delivered the judgment of the court, with opinion.

Presiding Justice Knecht and Justice Turner concurred in the judgment and opinion.

**OPINION**

In April 2009, a jury found defendant, Michael B. Brown, guilty of two counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2008)) for the deaths of Calvin Walls and David Walls and of aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2008)) in the shooting of Levar Walls. Additionally, defendant was found not guilty of aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2008)) in the shooting of Montell Jones. In June 2009, the trial court sentenced defendant to natural life in prison on each first-degree-murder conviction to run concurrent with a 30-year prison term for the aggravated-battery-with-a-firearm conviction.

Defendant appeals, arguing (1) the trial court erred when it instructed the jury mid deliberation with Illinois Pattern Jury Instructions, Criminal, No. 24-25.09 (Illinois

Pattern Jury Instructions, Criminal, No. 24-25.09 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 24-25.09); (2) the evidence was insufficient to convict defendant of two counts of first degree murder and one count of aggravated battery with a firearm beyond a reasonable doubt; and (3) defendant is entitled to a $5-per-day credit against fines imposed for time spent in jail awaiting trial and sentencing. We affirm as modified and remand with directions.

## I. BACKGROUND

At defendant's jury trial, Detective Daniel Donath, a crime-scene detective for the City of Bloomington, testified he went to an apartment building located in the 300 block of Riley Drive, Bloomington, Illinois, on February 12, 2008. When he arrived, he was told by another detective two deceased persons were found in the hallway between apartments five and six. He entered the building and noticed a bullet shell casing on the stairs leading to apartments five and six. As he walked up-stairs, he saw the deceased body of David Walls on the landing outside the apartments. To the right of David Walls, he noticed the deceased body of Calvin Walls. He also noticed additional shell casings in the hallway and patterns of blood on the hallway doors and walls. Upon entering apartment six, he observed a small spot of pooling blood on the living-room carpet. Also in the living room of apartment six, he observed shell casings on the floor, a black-handled knife on top of a big screen televi-sion, and a small black-handled paring knife underneath a fish

tank. He also noticed four holes in the front door.

Detective Donath exited the back door of apartment six and proceeded to apartment five. He noticed a trail of blood coming from the carpet of apartment five that continued on the carpet and walls leading to the back door of the building. In apartment five, he observed shell casings on the living-room floor. He also observed a few holes in the living-room wall, a hole by the front door that was approximately waist-high, and a hole in the ceiling by the front door. He found a box for a Glock handgun containing a receipt showing the gun was purchased on October 4, 2000, by Rogers T. McElroy. He also found a magazine for a Glock handgun in the bedroom. Outside the apartment building, he observed a blood trail leading from the back entrance of the building to 601 Bradley, Bloomington, Illinois.

Additionally, he testified in April 2008 he responded to a call regarding a handgun found at Oakbrook Court Apartments in Bloomington, Illinois. He retrieved the handgun that was found on the roof of a single-story garage.

Detective Timothy Power, a detective for the City of Bloomington, testified he was dispatched to the scene of the incident on February 12, 2008. He observed two deceased black males on the upstairs landing of the apartment building. The bodies were later identified as David Walls and Calvin Walls. The two bodies were facedown with David Walls lying on top of Calvin Walls.

While in the hallway, he heard a male voice in apart-

ment six crying in pain and saying he had been shot.  The male was later identified as Levar Walls.  Levar was lying on the living-room floor in a pool of blood.  Levar told Detective Powers "Bam" had shot him and his two brothers.

Detective William Buchanan, a detective with the Bloomington police department, testified he was one of the initial officers dispatched to the call of shots fired at Riley Drive.  While in apartment five, Detective Buchanan noticed the entire framework of the front door, including the door, was pushed inward.  The door was still closed and undamaged

Detective Brent Smallwood, a detective with the Bloomington police department, testified he was also dispatched to the crime scene.  Upon arrival, he parked his squad car at the corner of Mecherle and Riley Streets to question individuals leaving the area.  When he stopped Jerry Nored's vehicle, Nored stated his passenger, Montell Jones, had been shot.  Jones told Detective Smallwood he had been shot in the leg and arm.

Eric Purchis, a paramedic for the City of Bloomington, testified he was dispatched to Riley Drive to treat multiple gunshot wounds.  He testified he treated Montell Jones, who had two gunshot wounds in his left forearm, two gunshot wounds in his right forearm, and one gunshot wound in his outer right calf.

Tracy Miller testified she lived at 333 Riley Drive, apartment two, in February 2008.  On February 12, 2008, defendant briefly visited the apartment Miller shared with her boyfriend, Darron Epps.  Defendant lived upstairs in the same apartment

building.  After defendant left, Miller heard a loud commotion on the stairs outside her apartment.  Both she and Epps went into the hallway to determine the source of the commotion.   While in the hallway, she observed David, Calvin, and Levar Walls being shoved out of defendant's apartment.  She then observed the brothers attempt to regain entry by kicking and pushing the front door.  As she was heading back to her apartment, she heard a loud bang that sounded like a door being kicked open.  She also heard several gunshots and a commotion down the back stairwell.  She then heard a young man screaming and two children crying.  She ran upstairs and observed two men lying on top of each other in the doorway of Levar Walls' apartment.  She also observed Levar Walls lying on the living-room floor in front of the fish tank, and two children sitting on the couch.  She grabbed the children and went down the back staircase to her apartment.  As she was going downstairs, she noticed blood on the stairs and wall.

Darron Epps testified he was in his apartment watching television with his girlfriend, Tracy Miller, on the night of the shooting.  Defendant was visiting their apartment when they heard noises coming from defendant's upstairs apartment.  Defendant left to check on his apartment.  After defendant left, Epps continued to hear loud noises coming from defendant's apartment, and he went upstairs to investigate.  He observed defendant pushing people into his apartment, while Levar Walls pushed people into the hallway.  Once defendant's friends were inside his apartment, the door was closed.  It is unclear from Epps'

- 5 -

testimony whether defendant or Levar closed the door to defendant's apartment.  Epps observed a man kick defendant's front door off its hinges and the three men enter defendant's apartment.  Epps then heard gunshots, and he ran back to his apartment.  He stayed in his apartment until he heard Levar Walls calling for help.  As he was going upstairs, he noticed two men lying in the hallway by the front door to apartment six.  He testified he did not observe anything in anyone's hands during the altercation.

Levar Walls testified in February 2008 he lived at 333 Riley Drive, apartment six, with his girlfriend, Tanesha Phillips.  On February 12, 2008, he was inside his apartment when he heard a loud noise at his front door.  He opened the door and saw his two brothers arguing with a tall black man, a white man, and Montell Jones in the hallway outside defendant's apartment.  He went into the hallway and grabbed his brothers.  The tall black man attempted to hit Calvin, and the white man and Jones grabbed David and pulled him into defendant's apartment.  Because the apartment door had been locked, Calvin kicked the door open.  Levar and Calvin grabbed David and headed to Levar's apartment.  Levar testified he was not holding anything in his hands during the confrontation, and he did not observe anything in his brothers' hands.  He further testified he did not enter defendant's apartment that night, and he did not see Calvin enter the apartment.

As Levar walked back to his apartment, he heard a

- 6 -

loud bang.  He turned around and saw defendant shooting a gun at him.   He was shot twice in the buttocks before he was able to reach his apartment.  He entered his apartment and closed the door, but defendant continued shooting through the closed door.  Levar was knocked down by a shot to his leg.  Defendant then entered the apartment, pointed the gun at Levar, and said he was going to kill him.  David and Calvin ran upstairs to Levar's apartment, and defendant turned around and immediately started shooting at them.  Calvin reached the front door of the apartment before defendant shot him.  David reached defendant and attempted to push his left arm down before falling on top of Calvin.  Defendant then left the apartment building with his friends.

Leonard Hosea testified he was at defendant's apartment playing video games.  He testified defendant, a white guy, Montell Jones, and defendant's uncle were also present.  Everyone was in the living room when he heard pounding on the front door. Defendant answered the door, and Hosea heard a man ask defendant if his brother was in the apartment.  Defendant's uncle claimed he knew the man from prison, but the man said he was mistaken.  When defendant's uncle stood up, the man entered the apartment and pushed defendant's uncle in the face.  Hosea and defendant tried to intervene and prevent the men from fighting.  Hosea testified a second man entered the apartment and started fighting with Jones.  He further testified he did not observe anything in the two men's hands during the confron-

tation.  Hosea exited the apartment before the gunshots oc-
curred.

Tanesha Phillips testified on February 12, 2008, she
lived at 333 Riley Drive, apartment six, with her boyfriend,
Levar Walls.  That night, she heard a loud knock at the front
door.  Levar opened the door and went into the hallway.  He
came back into the apartment, and told Phillips his brothers
were arguing in the hallway.  He then stepped back out into the
hallway.  Phillips went to the open door and saw Levar, David,
and Calvin standing in the hallway.  Because the argument was
getting louder, she went into the kitchen, grabbed a butcher
knife, and set it on the television in the living room. She
then heard gunshots and rushed to the front door.  She observed
defendant in the hallway holding a gun and sparks coming from
the gun.  Levar ran through their front door, and closed the
door behind him.  She observed bullets coming through the front
door, striking Levar.  Defendant entered the apartment and told
Levar not to play with him because he would kill Levar.
Defendant then turned around and started shooting into the
hallway.  Defendant left the apartment after firing the gun
several more times.

Phillips was trying to locate her car keys when she
noticed David lying in her doorway.  After she found the keys,
she left the apartment to bring their car around front.  When
she opened the back door of her apartment, she saw defendant
and his friends running out the back door of defendant's apart-

ment.

David Robinson testified on the evening of February, 12, 2008, a black male knocked on his back door and asked to use his telephone. Robinson told the man he did not own a telephone, but he could find a phone at the local gas station.

Eric Foster testified on February 12, 2008, he was at defendant's apartment playing video games when he heard a knock at the front door. Defendant answered the door, and Foster heard Montell Jones' uncle say he recognized one of the men at the door. After words were exchanged, the three men in the hall tried to enter the apartment. Foster grabbed the man who entered the apartment in an attempt to calm him down, but the man slammed him against the living-room wall.

He then noticed defendant walking toward the living room with a pistol. Foster was in the kitchen when he heard five or six gunshots. However, he did not see the person firing the gun. Jones told Foster he had been shot, and Foster ran out the back door of the apartment with Jones and Jones' uncle. He returned to the apartment to retrieve his and Jones' coats, and he saw two men lying in the hallway outside the apartments. He went back outside and noticed Jerry Nored pull into the parking lot, and he asked Nored for a ride to the hospital. The police stopped the truck before they reached the hospital.

Steven Clifford, an officer for the Bloomington police department, testified once defendant was placed in

custody, he repeatedly asked defendant for the location of his weapon. Eventually, defendant informed him he had thrown it somewhere but did not know its location. On April 17, 2008, Officer Clifford observed a handgun on a garage roof at Number One Oakbrook, Bloomington, Illinois.

Michael Johnson, an officer for the Bloomington police department, testified on February 13, 2008, he was transporting defendant to the police department when defendant informed him he wanted to turn himself in, and it was not his fault. Defendant also stated he felt bad about the incident. Officer Johnson further testified defendant appeared visibly shaken.

Montell Jones testified he was playing video games at defendant's apartment with defendant, Leonard Hosea, Eric Foster, and his uncle, Andrew Walker. While they were playing video games, two men knocked on the door. Walker said he recognized one of the men, but the man denied knowing Walker. Everyone in the apartment walked toward the door where the two men were standing. After words were exchanged, the man Walker had recognized swung at Walker, while the second man pushed Jones into the living-room wall. Jones then noticed defendant and Walker were holding the door closed. Jones asked for help because the second man was choking him. Both Walker and defendant were walking toward Jones when the front door was kicked in by the men in the hallway. He observed people enter the apartment, but his attention was returned to the man attacking

him.  When he looked down, he noticed he had been shot in the arm.  Defendant and Walker helped him leave the apartment.  He had been shot in his right arm, his left arm, and his right leg.

Andrew Walker testified on February 12, 2008, he went to defendant's apartment.  He was under the influence of alcohol when he arrived.  While at defendant's apartment, he heard a loud knock at the door.  He recognized one of the men at the door from prison, but the man denied knowing him.  Walker responded he did know him, and the man attacked him.  Defendant was able to push the man out of the apartment and close the door.  Before the door was closed, Walker noticed Levar Walls standing in the hallway, holding something that looked like a knife.  The front door was kicked open, and the man Walker had recognized entered the apartment.  He threw Walker to the ground and started punching him.  Walker then heard gunshots and heard Jones say he had been shot.  He helped Jones exit the apartment through the back door, and he saw defendant standing outside the building.  He testified defendant had something in his hand.

Dr. Edward Kolb testified he treated Levar Walls and Montell Jones for multiple gunshot wounds.  He noticed both patients had three gunshot wounds.

Chad Wamsley, a detective for the City of Bloomington, testified he interviewed Andrew Walker regarding the February 12, 2008, incident.  The interview was recorded

and played for the jury.  During the interview, Walker told Detective Wamsley he ran into a man outside the apartment building who was carrying a black-colored handgun.  He also stated he thought the man he observed standing outside the apartment door was carrying a gun.   Walker was not forthcoming about the identity of the man with the gun.

Rogers McElroy testified on October 4, 2004, he purchased a Glock 10-millimeter handgun at a pawnshop.  McElroy testified defendant had probably seen him with that gun.  He was unaware the gun was missing from his residence until the police contacted him and advised it had been found.

Dr. John Scott Denton testified on February 14, 2008, he performed autopsies on Calvin and David Walls.  He testified David Walls had a gunshot wound on the right side of the but-tock, a gunshot wound in the left hip area, a close-range gunshot wound on the right side of his face beneath his right eye, a gunshot wound on the left mid-back area, and also vari-ous bruising and scratching injuries consistent with a fight or altercation.  Additionally, he testified the gunshot wounds on David Walls' chest and body were consistent with a range greater than 18 to 24 inches.

Next, Dr. Denton testified Calvin Walls had a gunshot wound on his right wrist consistent with a range greater than 18 to 24 inches, and also a close-contact gunshot wound to the left side of his head.  Calvin also had small abrasions on the right side of his forehead and right eyebrow consistent with

- 12 -

injuries caused by a fight or altercation.

Defendant testified in February 2008 he lived at 333 Riley Drive, apartment five, Bloomington, Illinois. On the night of the occurrence, he was in his apartment playing video games and drinking with Montell Jones, Eric Foster, Andrew Walker, and Leonard Hosea. While playing video games, he heard a loud knock at his front door. When he answered the door, he recognized Calvin Walls. Andrew Walker said he recognized Calvin from prison, but Calvin denied knowing him. While standing in the doorway, defendant noticed David Walls in the hallway.

Calvin and Walker continued to exchange words, and Calvin attempted to enter the apartment. Defendant prevented Calvin from entering the apartment. Defendant noticed Levar Walls approach, pull on Calvin's jacket, and then return to his apartment. According to defendant, Levar returned with a knife a few seconds later. Calvin swung at Walker, and David attacked Jones. Defendant attempted to push Calvin outside the apartment, while also trying to prevent Levar from entering. However, Calvin pushed defendant back and attacked Walker.

Levar then entered the apartment carrying a knife. While in the apartment, Levar helped Calvin drag Walker toward the outside hallway. Eventually, defendant was able to remove Calvin from the apartment while keeping Walker inside. Walker and defendant locked the front door to prevent the brothers from getting inside the apartment, but the brothers began

kicking the door. Defendant heard them say their brother was still inside, and the people inside the apartment were going to kill him. Defendant went to the kitchen to get his handgun. After the apartment door was forced open, Walker released David, and David exited the apartment. Calvin entered the apartment and started threatening everyone. Defendant pleaded with Calvin to leave the apartment. Defendant testified the people in the hallway outside his apartment had knives.

Defendant thought he saw David and another person enter his apartment. He fired the gun in the direction of Calvin and David. However, the men continued attacking the guests in his apartment. From his doorway, defendant observed Levar reach into his own apartment, grab a knife, and swing it at him. In response, defendant shot Levar in the lower body. Levar fell in the doorway of his apartment, and defendant approached to check for additional weapons. When he turned to go back to his apartment, Calvin and David attacked him and tried to take his gun. During the struggle, he fired the gun several times. He went back to his apartment, but it was empty. He exited through the back door, and he saw Walker, Jones, and Foster on the back staircase. Once outside, he ran from the building and threw the gun away. He knocked on a man's door and asked to use his phone, but the man refused. He then knocked on a lady's door, and she called the police for him.

On cross-examination, defendant testified he put four

bullet holes in Levar's front door, but Levar was standing outside the apartment in front of the door. Additionally, he testified he was in close physical contact with both Calvin and David when he fired the shots in the hallway.

During the April 2009 jury-instruction conference, the State tendered an instruction setting forth an initial aggressor's responsibilities before a use of force can be justified. The trial court refused to submit the instruction to the jury, stating, although there was ambiguity in the evidence regarding who initially provoked the use of force, there was no direct testimony by any eyewitness as to who threw the first punch.

During deliberations, the jury inquired about the legal justification for an initial aggressor's use of force. The trial court allowed the initial-aggressor instruction to be tendered to the jury over defense counsel's objection. In allowing the instruction, the court stated it had a duty to appropriately respond to jury questions, and the instruction directly answered the inquiry.

The jury found defendant guilty of two counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2008)) for the deaths of Calvin Walls and David Walls and of aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2008)) in the battery of Levar Walls. Additionally, defendant was found not guilty of aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2008)) in the battery of Montell

- 15 -

Jones.

In May 2009, defendant filed a motion for judgment of acquittal notwithstanding the verdict or, in the alternative, for acquittal asking the trial court to vacate the judgment entered on the jury's verdict. In particular, defendant argued the court erred in submitting the initial-aggressor instruction to the jury mid deliberation.

In June 2009, the trial court denied defendant's motion. Regarding the initial-aggressor instruction, the court stated it had a duty to provide instruction because the jury asked a specific question. The trial court sentenced defendant to natural life in prison on each first-degree-murder conviction to run concurrent with a 30-year prison term for the aggravated-battery-with-a-firearm conviction.

This appeal followed.

II. ANALYSIS

A. Jury Instruction

A trial court's decision to answer a jury question will not be disturbed absent an abuse of discretion. *People v. Brown*, 319 Ill. App. 3d 89, 100, 745 N.E.2d 173, 184 (2001). When faced with a jury question during deliberations, "the general rule is that the trial court has a duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion." *People v. Childs*, 159 Ill. 2d 217, 228-29, 636 N.E.2d 534, 539 (1994). Failure

to specifically and accurately answer a jury question has been held to be prejudicial error. *Brown*, 319 Ill. App. 3d at 100, 745 N.E.2d at 184.

However, under appropriate circumstances, a trial court may exercise its discretion and properly refrain from answering the question. *Childs*, 159 Ill. 2d at 228, 636 N.E.2d at 539. The court may decline to answer a jury question when (1) the instructions are readily understandable and sufficiently explain the relevant law; (2) further instruction would serve no useful purpose or would potentially mislead the jury; (3) the inquiry involves a question of fact; or (4) answering the question would cause the court to express an opinion that could potentially direct the verdict. *Childs*, 159 Ill. 2d at 228, 636 N.E.2d at 539.

If the trial court provides instruction to the jury mid deliberation, it must refrain from submitting instructions on new case theories. *People v. Millsap*, 189 Ill. 2d 155, 161, 724 N.E.2d 942, 946 (2000). Both parties are entitled to instructions pertaining to their separate theories of the case; however, evidence must be presented on a particular theory before an instruction may be submitted. *People v. Fleming*, 155 Ill. App. 3d 29, 37, 507 N.E.2d 954, 959 (1987).

An initial-aggressor instruction is warranted when either the State presents evidence that defendant was the aggressor or the case involves a question of whether defendant was the aggressor. *People v. Heaton*, 256 Ill. App. 3d 251,

257, 631 N.E.2d 247, 251 (1994). Tendering the self-defense instruction, along with the initial-aggressor instruction, allows the jury to resolve conflicts in evidence and apply the appropriate law. *Fleming*, 155 Ill. App. 3d at 37, 507 N.E.2d at 959.

Additionally, although the right of self-defense may justify a use of force, it will not justify the killing of an original aggressor as an act of retaliation or after the aggressor has abandoned the argument. *People v. De Oca*, 238 Ill. App. 3d 362, 368, 606 N.E.2d 332, 336 (1992). In *De Oca*, 238 Ill. App. 3d at 367-68, 606 N.E.2d at 336, the victim was the initial aggressor in a fistfight with the defendant; however, the evidence indicated the confrontation escalated into a different encounter when defendant displayed a loaded shotgun and shot the victim. Therefore, the court held the trial court did not err in determining defendant was the aggressor at the time of the shooting. *De Oca*, 238 Ill. App. 3d at 368, 606 N.E.2d at 336.

In the present case, during the April 2009 jury-instruction conference, the State tendered IPI Criminal 4th No. 24-25.09, which stated as follows:

> "A person who initially provokes
> the use of force against himself is justified
> in the use of force only if *** the force used
> against him is so great that he reasonably
> believes he is in imminent danger of death or

- 18 -

great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person."

The trial court refused to tender the instruction to the jury because the evidence regarding the origin of the fight was ambiguous and no direct eyewitness testimony suggested who threw the first punch.

During deliberations, the jury asked the following question:

"Does a person who has initially provoked the use of force against himself have a duty to attempt to escape the danger before using force against the aggressor?"

In response, the trial court allowed the initial-aggressor instruction to be submitted to the jury because the instruction specifically answered the jury question.

Defendant argues the trial court erred in tendering the jury instruction mid deliberation because none of the evidence suggested defendant was the initial aggressor in the confrontation. Additionally, defendant argues the jury was confused when it submitted the question because it was either inquiring about the rights and duties of the Walls brothers, or it mistakenly believed defendant was the initial aggressor. Therefore, defendant argues the instruction served no useful

purpose and potentially misled the jury.  We disagree.

The jury was provided with a self-defense instruction prior to deliberations.  The jury was also instructed a person who is not an aggressor has no duty to attempt escape before using force against an aggressor.  However, the jury was not initially presented with an instruction regarding the legal justification for an initial aggressor's use of force.  The lack of instruction was especially significant because the State argued defendant became the aggressor in the conflict when he pursued and shot Levar Walls as Levar was retreating. Additionally, the State argued defendant became the aggressor when he shot Calvin and David Walls in the hallway.

The trial court had a duty to appropriately address the question posed by the jury.  While the evidence on the issue of initial-aggressor status may have been ambiguous, it was a matter for the jury to determine.  The jury clearly stated its question and there was a relevant IPI instruction on the topic.  Additionally, when the court submitted the new instruction mid deliberation, it was not injecting a new theory into the case.  Like in *De Oca*, the State had argued defendant became the aggressor when he shot three of the victims after they had abandoned the initial confrontation.  After hearing the State's argument, it was reasonable for the jury to consider the legal justification for an initial aggressor's use of force.  Tendering this instruction to the jury allowed it to resolve the conflicts in testimony and apply the correct law.

Additionally, the trial court noted the evidence did not completely absolve defendant of being the initial aggressor. Therefore, the jury could have reasonably concluded defendant was the initial aggressor. It seems, however, the trial court was thinking only in terms of the initial fistfight in defendant's apartment when discussing the initial-aggressor issue during the instruction conference. However, the evidence did support the jury's determination defendant became the aggressor when he shot each of the Walls brothers. Providing the initial-aggressor instruction to the jury would not direct a verdict on the issue, because the jury was presented with both a self-defense instruction and an instruction regarding the legal justification for a nonaggressor's use of force. Consequently, the trial court appropriately addressed the jury question by tendering an instruction that provided a correct statement of law on the issue.

## B. Sufficiency of the Evidence

Next, defendant argues the evidence was insufficient to convict him of two counts of first degree murder and aggravated battery with a firearm beyond a reasonable doubt. We disagree.

### 1. *Self-Defense*

The question on review is whether, after viewing all of the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt defendant did not act in self-defense. *People v.*

*Grayson*, 321 Ill. App. 3d 397, 402, 747 N.E.2d 460, 465 (2001). A person acts in self-defense when (1) the person is threatened with unlawful force, (2) the person threatened is not the aggressor, (3) the danger of harm is imminent, and (4) the use of force is necessary. *Grayson*, 321 Ill. App. 3d at 402, 747 N.E.2d at 464-65. It is the State's burden to prove beyond a reasonable doubt that defendant did not act in self-defense. *People v. Dillard*, 319 Ill. App. 3d 102, 106, 745 N.E.2d 185, 188 (2001). However, a jury has discretion to reject a self-defense claim based on the probability or improbability of defendant's account, the circumstances of the crime, the testimony of the witnesses, and witness credibility. *Dillard*, 319 Ill. App. 3d at 106, 745 N.E.2d at 189.

At trial, defendant argued he was acting in self-defense when he shot Levar Walls. According to defendant's testimony, Levar entered defendant's apartment and was waving a knife around. Later, defendant observed Levar reach into his apartment for a knife and swing it at him. In support of his testimony, defendant notes a knife was found on the living-room floor underneath the fish tank in Levar's apartment. However, the State presented evidence to explain the location of the knife, such as testimony the living room was cluttered and the kitchen table was near the fish tank. Additionally, the State offered evidence no knife wounds were found on any person involved in the altercation. Only one witness, other than defendant, testified he observed something in Levar's hands

- 22 -

that night, but he could not specifically say whether the object was a knife. Also, Levar testified he was not carrying a knife. He testified he heard the gunshots and retreated to his apartment, but defendant pursued him and shot him as he entered his apartment. Additionally, the State argued the location of the bullet holes in Levar's front door and the location of his injuries were not consistent with defendant's testimony.

Also at trial, defendant argued he acted in self-defense when he shot both Calvin and David Walls in the hallway of the apartment building. Defendant testified he had approached Levar to check for additional weapons when he was attacked by Calvin and David. Additionally, defendant testified he was in close physical contact with David and Calvin when they attempted to grab his gun. However, the State presented evidence that both Calvin and David were fleeing defendant's apartment and had only returned to Levar's apartment after hearing additional gunshots. Also, to contradict defendant's self-defense claim, the State presented evidence defendant fired the gun at least 14 times resulting in 11 gunshot wounds to the four victims, four out of five of the wounds on Calvin and David were fired from greater than two feet away, and the locations of the wounds on each victim were not consistent with defendant's testimony.

Conflicting evidence was presented regarding whether defendant was the aggressor in the confrontation. After

considering all of the evidence and observing the witness testimony, the jury was entitled to resolve the conflicts in testimony and reject defendant's self-defense claim. Looking at the evidence in the light most favorable to the State, sufficient evidence was presented to support the jury verdict.

## 2. *Defense of Dwelling*

Deadly force in defense of a dwelling is justified when (1) the victim's entry is made in a "violent, riotous, or tumultuous manner" and (2) defendant's subjective belief that deadly force is necessary to prevent an assault upon him or another in the dwelling is reasonable. *People v. Sawyer*, 115 Ill. 2d 184, 192, 503 N.E.2d 331, 335 (1986). The reasonable-ness of defendant's subjective belief is a question of fact for the jury to determine. *People v. Evans*, 87 Ill. 2d 77, 86, 429 N.E.2d 520, 524 (1981). Additionally, for a defense-of-dwell-ing justification to be successful, "a defendant need only be within the confines *of his dwelling*." (Emphasis in original.) *People v. Morris*, 162 Ill. App. 3d 1046, 1055, 516 N.E.2d 412, 418 (1987). At trial, defendant argued his use of force was necessary to prevent an assault upon him or another in his dwelling. First, defendant testified the altercation was the result of an argument between Calvin Walls and Andrew Walker. Additionally, he testified Calvin and David entered his apart-ment in a violent manner and proceeded to attack his guests. In support of defendant's testimony, both Montell Jones and Andrew Walker testified they were in defendant's apartment when

- 24 -

the brothers attacked them. Defendant also testified at least one of the brothers had a knife in defendant's apartment. Additionally, defendant testified, while in the hallway, he was prevented from returning to his apartment by the brothers' attack.

In contrast, Levar testified defendant's front door was kicked open because David was locked inside the apartment. He also testified he had not entered defendant's apartment that night, nor was he armed with a knife when he was shot. Additionally, he testified he was fleeing defendant's apartment when he was shot at the threshold of his own apartment. Also, David and Calvin were both shot in the hallway of the apartment building. The State presented testimony that David and Calvin had exited defendant's apartment and were only returning to their brother's apartment because they heard gunshots. The State presented evidence of the location of their bullet wounds to support this testimony.

As evidenced by the fact the jury found defendant not guilty of aggravated battery with a firearm for the battery of Montell Jones, the jury determined defendant was not the initial aggressor in the confrontation that occurred within his apartment. However, sufficient evidence was presented to support the State's theory defendant became the aggressor when he shot Levar, David, and Calvin in the hallway outside his apartment. The question posed by the jury during deliberations suggests the jury believed the evidence pointed to defendant

being an aggressor in the conflict. Because sufficient evidence was presented to justify a determination defendant became an aggressor in the conflict, the jury was entitled to reject defendant's justification for defense of dwelling.

C. Credit for Incarceration on Bailable Offense

Defendant argues he is entitled to a $5-per-day credit for time served against his $15 children's-advocacy-center fee and his $10 drug-court fee. Section 110-14(a) of the Code of Criminal Procedure of 1963 provides:

> "Any person incarcerated on a bailable offense who does not supply bail and against whom a fine is levied on conviction of such offense shall be allowed a credit of $5 for each day so incarcerated upon application of the defendant. However, in no case shall the amount so allowed or credited exceed the amount of the fine." 725 ILCS 5/110-14(a) (West 2008).

The statutory right to a credit is mandatory, and a defendant is entitled to this credit despite it not being requested in the trial court. *People v. Woodard*, 175 Ill. 2d 435, 457-58, 677 N.E.2d 935, 946 (1997).

In this case, the trial court ordered defendant to pay $15 for the children's-advocacy-center fee and $10 for a drug-court fee but failed to grant the $5-per-day credit for time served. Although labeled a fee, the children's-advocacy-

center fee is a fine.  *People v. Jones*, 397 Ill. App. 3d 651, 660, 921 N.E.2d 768, 775 (2009).  Therefore, defendant is entitled to a $5-per-day credit against the $15 fine.  The drug-court fee is also a fine, and defendant is entitled to an additional $5-per-day credit against this $10 fine.  *People v. Sulton*, 395 Ill. App. 3d 186, 193, 916 N.E.2d 642, 647-48 (2009).  The State concedes defendant is entitled to the $5-per-day credit for the 475 days he spent in custody.  Accordingly, we remand this case and direct the trial court to amend the judgment order to grant defendant a credit against the $15 children's-advocacy-center fee and the $10 drug-court fee.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment as modified and remand with directions.  As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal.

Affirmed as modified; cause remanded with directions.