NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 200213-U

NO. 4-20-0213

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 27, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Coles County |
| KEITH McGREW, | ) | No. 19CF229 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | James R. Glenn, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Defendant failed to establish his counsel's ineffectiveness.

(2) The trial court did not abuse its discretion when ruling on the admissibility of certain witness testimony.

(3) The evidence was sufficient to establish defendant guilty of first-degree murder beyond a reasonable doubt.

(4) Prosecution errors did not deprive defendant of due process or a fair trial.

(5) Defendant failed to establish that cumulative error warranted a new trial.

¶ 2    Following a jury trial, defendant, Keith McGrew, was found guilty of first-degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2018)) and the trial court sentenced him to 52 years in prison. He appeals, arguing (1) his trial counsel provided ineffective assistance, (2) the court erred by allowing the admission of certain witness testimony, (3) the State failed to prove his guilt

beyond a reasonable doubt, (4) prosecutorial errors denied him his right to due process and a fair trial, and (5) the cumulative effect of the alleged errors warrants a new trial. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4          In May 2019, the State charged defendant with three counts of first-degree murder (*id.* § 9-1(a)(1), (a)(2), (b)(11)) in connection with the shooting death of Mark Currie. It alleged defendant shot Currie (1) with the intent to kill or do great bodily harm (count I) (*id.* § 9-1(a)(1)); (2) knowing that such act created a strong probability of death or great bodily harm (count II) (*id.* § 9-1(a)(2)); and (3) with premeditation (count III) (*id.* § 9-1(b)(11)). The State's theory of the case was that defendant shot Currie after becoming enraged by sexual comments Currie made to him. Defendant acknowledged that he shot Currie but maintained the act was done in self-defense during a physical confrontation and with the belief that "he was about to be raped."

¶ 5          Prior to trial, both parties filed various motions *in limine*. Relevant to this appeal, in December 2019, defendant filed a motion *in limine* "to determine witness availability and to recuse witness," asking the trial court to bar the State from calling his girlfriend, Cedrica Smith, as a witness at trial. Defendant noted Smith had been charged with obstruction of justice in connection with the underlying events and had asserted her intention to invoke her fifth amendment right against self-incrimination if called as a witness at defendant's trial. The record reflects the charge against Smith was based on allegations that she attempted to hide the gun defendant used to shoot Currie.

¶ 6          The same month, the State filed a motion *in limine*, seeking to admit statements Smith made to Timeka Griffin under the excited utterance exception to the hearsay rule. It noted Griffin gave a voluntary statement to the police, disclosing events that took place around the time

of the shooting and describing conversations she had with Smith while Smith was "scared, agitated[,] and crying" due to "[a]n inability to calm an enraged loved one," *i.e.*, defendant.

¶ 7        In January 2020, the trial court conducted a hearing and addressed both motions *in limine*. It first granted, in part, defendant's motion seeking to bar the State from calling Smith as a witness. The court found testimony related to Smith "placing the gun in a bag and taking it to a friend's house and leaving it there would tend to incriminate her" and, thus, she could invoke her fifth amendment privilege against self-incrimination as to such matters. However, the court stated Smith would have to respond to her subpoena and that it would "direct her to answer other questions that in [the] [c]ourt's view [did] not tend to incriminate her." The trial court also granted the State's motion to allow Griffin to testify about statements Smith made around the time of the shooting, agreeing they constituted excited utterances.

¶ 8        In January 2020, defendant's jury trial was conducted. The State's evidence showed that in the early morning hours of May 17, 2019, the police responded to a disturbance call at Sunrise Apartments in Mattoon, Illinois. The responding officers found Currie lying inside his mother's apartment near an open sliding glass patio door. Currie was unresponsive and had no pulse. Emergency medical personnel were called to the scene and provided medical assistance to Currie before taking him to the hospital. At the hospital, Currie was pronounced dead. An autopsy showed he suffered multiple gunshot wounds and died as the result of a gunshot wound to the chest. At the time of his death, Currie's height was 6 feet and 1 inch, and he weighed 249 pounds. Additionally, his blood and urine tested positive for the presence of cocaine, marijuana, and alcohol. Evidence showed defendant was shorter than Currie and weighed approximately 144 pounds.

¶ 9          After Currie's body was removed from the apartment complex, a crime scene investigator photographed the apartment, including an "area of disturbance" inside the apartment and near the patio door. The photographs were admitted into evidence and showed various items on the floor, an end table lying on its side, and broken items, including a lamp, fan, and blinds from the patio door.

¶ 10          Paramedic Aaron Mocek testified that he assisted Currie at the scene. He noted Currie was wearing pants that were zipped up and secured with a belt. Mocek testified his primary concern was taking care of Currie, not preserving the scene. He stated that as he rolled Currie over, one of the blinds from the patio door fell onto him and Currie. Mocek also stepped on and broke a light bulb. Further, he testified that others also assisted Currie and could have caused damage to the scene.

¶ 11          The State's evidence showed the firearm used in the shooting was recovered from the residence of Zaria Jones, who also lived at the apartment complex. Jones testified she was close friends with both Smith and Griffin and spent time with them on May 16, 2019, until approximately 7 p.m., when she returned home. Jones went to bed around 9 p.m. and, at approximately 10 p.m. and 1 a.m., received phone calls from Smith, which she did not answer. Following the last phone call, Griffin and Smith began "banging" on Jones's door and window. Jones let the women into her apartment and noticed that Smith appeared "jittery" and "nervous," and that she and Griffin were whispering. Later, after Griffin and Smith left Jones's apartment, Jones found a blue bag underneath her couch. Inside the blue bag was a gun. Jones called Smith, who "begged and pleaded" with Jones "not to say anything." Jones then confronted Griffin who was outside and in the company of the police. Following that confrontation, Jones allowed the police to search her

apartment.

¶ 12        Around 7 a.m. on May 17, 2019, officers with the Mattoon Police Department, Clint Lawrence and Jeff Wines, located defendant a few miles from the Sunrise Apartment complex. He was in the backyard of a residence, walking near a cornfield. The officers described defendant as wearing no shirt or shoes and having "a dingy shower curtain draped over his shoulder." Lawrence testified that after being placed in handcuffs, defendant made statements "that he had to protect himself" or "defend himself" from an individual who "wanted to perform oral sex on him." Wines recalled defendant mentioning "something along the lines of a sexual act, some sort of request," and stating, " 'he wanted me.' " He clarified that defendant "described a request or a want" but did not reference any actions taken by the other person toward defendant. Neither officer recalled seeing any injuries to defendant or hearing him complain of any injuries.

¶ 13        Smith testified for the State that in May 2019, she resided at Sunrise Apartments with her children and defendant, who was her boyfriend. She recalled that on May 16, 2019, she spent the day drinking outside with defendant and some friends. During the evening, defendant was "in and out" of her apartment. Sometime after midnight, defendant told her about someone making a comment that he did not like. According to Smith, defendant said he was outside and "[s]omeone had made a comment to him about sucking some d*** or something[.]" She testified defendant was "upset" by the comment but said "he was going to let it go."

¶ 14        Smith identified defendant on surveillance video exiting her apartment building at approximately 12:28 a.m., followed closely by herself. She denied being worried about what defendant was about to do, stating she only wanted to know where he was going and "really wanted him to stay in the house." Smith also denied that she tried to calm defendant down. Further, she

testified that defendant's demeanor when he left her apartment was "jittery" and "[l]ike he couldn't relax." She also characterized him as "nervous" and "disturbed" by the comment that had been made to him. However, Smith denied that defendant was in a "rage."

¶ 15 After following defendant out of the apartment, Smith spoke to some individuals outside and visited Griffin in a nearby apartment, inquiring whether Griffin had seen defendant. While at Griffin's apartment, Smith heard a "commotion." She went outside and saw defendant, who was "screaming" that " 'this m*** f*** tried to rape me' " and asking where his phone was. Defendant also "screamed out that he 'smoked his ass,' " which Smith stated was "slang that [defendant] just shot someone." According to Smith, defendant seemed scared. She stated he "ran off" but returned a short time later, continuing to state that "this guy tried to rape him." Smith denied knowing defendant to be a person who carried a gun or that she ever saw him with a gun, including on the day of the shooting.

¶ 16 Smith recalled providing a statement to the police and reporting that before the shooting, defendant stated someone "asked him to suck his d*** for money" and that defendant was "really upset." She acknowledged reporting that she was worried about defendant and reached out to Griffin after she "tried to get [defendant] to settle down and couldn't." She also agreed that she told the police that defendant indicated he shot someone because the person "was gay and asked [defendant] to suck his d*** or something." However, Smith asserted she also told the police she "didn't know the exact things that [defendant] screamed out." Smith denied that her memory of the underlying events was better closer in time to the shooting. Additionally, she testified that she and defendant were still together, she loved him, and it would be very upsetting for her to see him get into trouble.

- 6 -

¶ 17         On cross-examination, Smith testified she followed defendant out of her apartment when he left at approximately 12:28 a.m. because he "just left" after receiving a text message or a phone call and she wondered where he was going at that time of night. She asserted she was worried because defendant was with men she did not know, he was intoxicated, it could get "really loud and crazy" at the apartment complex, and she was ready for defendant "to come in the house." Smith also testified that during her interview with the police, she was afraid. She stated the police threatened to take her kids and put her in jail. Additionally, she described defendant as having an addictive personality. She asserted he "like[d] to drink," "smoked weed," would "pop a pill sometimes," and had started doing cocaine. Finally, Smith acknowledged that she had been accused of taking a gun to Jones's house and charged with a felony based on those accusations.

¶ 18         Griffin testified and acknowledged that she had been charged with obstructing justice based on allegations that she assisted Smith in hiding the murder weapon. She further admitted that she was offered a deal by the Coles County State's Attorney's Office in exchange for her truthful testimony. She stated that she had been granted immunity for her testimony and the State agreed to dismiss the charge against her.

¶ 19         Griffin stated she knew Smith through her brother, with whom Smith had children, and often referred to Smith as her sister. She recalled that around 10 p.m. on May 16, 2019, Smith came to her apartment "and said she was worried that [defendant] was going to get into a fight" and that he "was in a rage." Smith stated she was going to call defendant and left. Griffin testified Smith returned to her residence at around 12:30 a.m. She did not recall their conversation at that time but asserted that not long after she arrived, Smith "shot out of the house." Griffin followed Smith and observed defendant "hollering, [']He tried to rape me, he just tried to rape me. I popped

his ass.' "

¶ 20        Griffin recalled being interviewed by the police on May 17, 2019. She maintained she was truthful in that interview and recalled stating that when Smith came to her residence at 12:30 a.m., Smith stated, " 'he's in a rage and I couldn't stop him.' " Griffin reported Smith stated she was scared and that defendant went " 'shooting out the door.' "

¶ 21        The State's evidence further showed defendant was interviewed by the police on May 17, 2019. Police officers participating in the interview included Alex Hesse, a detective with the Mattoon Police Department, and Jason Taylor, the police chief for the City of Mattoon. Hesse testified that at the time of the interview, he did not observe any signs that defendant was impaired by drugs or alcohol, nor did he observe any injuries to defendant. Hesse testified regarding his observations of defendant during the interview, stating defendant "was very hard to *** focus on anything." He stated defendant talked over interviewers, changed the subject, would "shut down" and not speak if he was asked a question that he did not want to answer, and continually "circle[d] back *** to parts of the story that he wanted to be able to provide." Hesse testified that a suspect's attempt "to control the narrative" during an interview suggested to him that the person was "trying to only let out parts of a story or part of a narrative that [the suspect] want[ed] told" and that the suspect did not "want other facts to come in[.]"

¶ 22        Hesse further acknowledged lying to defendant during the interview, which he stated could be an effective interview tactic. In particular, he stated he lied when he told defendant during the interview that he "believed him [100%]." Hesse testified that during the interview, he did not recall defendant describing a specific physical act by Currie toward defendant. Defendant did admit that he was angry that Currie "came on to him" earlier in the evening when Currie asked

to perform oral sex on defendant. According to Hesse, defendant admitted multiple times that he was "defending his manhood when he shot [Currie]."

¶ 23 Taylor also described defendant's "demeanor" during the interview, stating as follows: "He was evasive. He was stone-walling, and at times he would just flat-out lie." He stated defendant refused to answer "simple questions" and "would only answer questions that were favorable to his version of events." Taylor testified that one of the times he felt defendant was being "evasive" was when he was asked questions about his "struggle" with Currie. He noted defendant did not state how the struggle started, where the struggle took place, or where the gun was on his person. Taylor also believed defendant's story was "suspect" because he did not have any injuries after reportedly wrestling with Currie, who was much larger than defendant.

¶ 24 Taylor also testified that during the interview, he lied to defendant and "applied some pressure." He believed those were effective tactics because defendant's attitude changed and he "opened up." In Taylor's opinion, defendant "realized that the stakes" were "an awful lot higher and it's time to be honest."

¶ 25 Taylor further testified that although he asked defendant about physical acts by Currie, defendant did not describe any actual physical act that Currie made against him. Rather, defendant only described "a single sexual request by [Currie] towards him." Specifically, defendant reported that Currie offered defendant $35 for Currie to perform oral sex on defendant. The following colloquy then occurred between the prosecutor and Taylor:

"Q. Is offering to suck someone's d***, and I apologize for the language, but is offering to do a sexual favor rape?

A. No."

¶ 26    A recording of defendant's interview with the police was admitted into evidence and played for the jury. During the interview, defendant repeatedly asserted Currie tried to "rape" him and that the shooting occurred because Currie was "on some gay s***." He reported he first contacted Currie prior to the shooting because he wanted to obtain cocaine. Thereafter, the two spent time "outside," drinking and snorting cocaine. Defendant indicated Currie made advances toward him and offered defendant $30 or $35 for Currie to perform oral sex on defendant. Defendant initially asserted Currie propositioned him while they were outside but, later, asserted Currie requested to pay defendant for oral sex once they were alone together in Currie's apartment.

¶ 27    According to defendant, Currie continued to make sexual comments to him inside the apartment and then exposed his penis. Defendant stated Currie then "got up," "came toward" him, and "grabbed" him. He asserted Currie "tussled" and "wrestled" with him before the shooting but stated he could not remember where Currie was or what he was doing when he was shot. When an officer asked whether Currie was sitting on the couch when he was shot, defendant nodded his head affirmatively. He then maintained that Currie exposed his penis a second time. Defendant also stated Currie "fell back on the couch and that's when it happened." He then indicated Currie came toward him again after falling onto the couch. Defendant denied knowing how many times he shot Currie. He also denied knowing where the gun used in the shooting was located, stating he did not have a gun, did not give the gun to anyone, and did not put the gun anywhere. Later, defendant stated he left the gun in Currie's apartment. Defendant also stated he did not remember where he had the gun on his person before he shot Currie.

¶ 28    When asked by police officers if he was angry while at Smith's apartment because Currie came onto him, defendant, again, nodded his head affirmatively. When officers then asked

- 10 -

whether defendant left Smith's apartment to go rob Currie or to "stick up for his manhood," defendant stated he "was sticking up for his manhood." Defendant admitted being "mad" and "pissed" by Currie's comments. When asked whether he got the gun to "confront" Currie and things "went bad," defendant stated, "yeah, that was pretty much it."

¶ 29 Defendant asserted he retrieved the gun because Currie was "on some gay s***" and defendant had "a funny feeling." After he got the gun, he went to Currie's apartment because he "wasn't done partying." Inside the apartment, Currie "put his d*** in [defendant's] face" and "then he grabbed [defendant's] d***." Defendant asserted he and Currie argued and "wrestled." According to defendant, Currie fell on the couch and defendant shot him. Defendant maintained that although he "was mad" when he went to Currie's apartment, the shooting was not "premeditated" and things with Currie "went left."

¶ 30 At trial, defendant testified on his own behalf. He stated in May 2019, he was residing at the Sunrise Apartments in Mattoon with Smith. The first time he saw Currie, he observed him "punching" another individual. On May 16, 2019, Currie helped him obtain cocaine. Around 8:30 p.m., the two spent time with Currie's friends at a park. As defendant and Currie were leaving the park, Currie made sexual comments, indicating that oral sex and sexual intercourse between men was not "gay." Defendant asserted Currie's comments made him feel "awkward." The two also discussed defendant going to Currie's mother's apartment. However, they separated and defendant "finished hanging out" with some other individuals in front of Smith's apartment building. Defendant also returned to Smith's apartment and informed her that Currie was "saying gay s***" or "on some gay s***."

¶ 31 Around 12:30 a.m., defendant received a text message from Currie, indicating

- 11 -

Currie was getting more cocaine and asking if defendant wanted any. Defendant then left Smith's apartment but "grabbed a gun" because he intended to go "hang out" with Currie. When defendant arrived at the apartment, he went inside and drank and did cocaine with Currie. Defendant testified that while he was "snorting" cocaine, he looked up and saw that Currie, who was seated on the couch, "had pulled his penis out." Defendant informed Currie he "ain't like that" and to "put [his] d*** up." According to defendant, Currie then stood up and "pulled his pants up and stuff," while defendant gathered his belongings to leave. He testified, however, that Currie "grabbed" him, "grabbed [defendant's] d***," and stated, "you suck my d***." The two were then "tussling and wrestling." Defendant stated he pushed Currie back "towards the couch" and then Currie "charged at [him]." He further testified as follows:

> "I'm backing up trying to, you know, I'm trying to watch him at the same time, but I'm like trying to get to the door, you know. Then I pulled the gun out. I thought when I pulled the gun out he was going to stop like coming towards me, but he never stopped coming. He just kept coming. And I just started firing it. And he grabbed me. We backed up. He still ain't trying to let me out the door. Again, you know, we was wrestling. The gun fall. It just start falling. He grabbed the gun, and then he just felt [*sic*] out. I just ran out the door, because that was my objective to get out the door."

¶ 32      Defendant testified he ultimately ran from the scene. As he was running, he took his shirt off and threw it because it had blood on it. Defendant stated he ran away because he was confused, scared, and panicked. He denied taking the gun with him from Currie's apartment.

¶ 33      Additionally, defendant acknowledged using drugs. Specifically, he stated he

regularly used "weed" and alcohol, and "from time to time" he used PCP. Approximately a month and a half to two months prior to the shooting, he began using cocaine. Defendant denied that he shot Currie because he thought Currie was gay.

¶ 34    On cross-examination, defendant testified he did not remember where he kept the gun on his person after retrieving it from Smith's apartment. He also denied that Currie offered him money for Currie to perform oral sex on defendant. On redirect examination, defendant testified he feared Currie was going to overpower and "rape" him.

¶ 35    Defendant also presented expert witness testimony from Tammi Clancy, a certified alcoholism and drug addictions counselor. Clancy described the effects of both alcohol and cocaine on the human brain. She stated cocaine could cause paranoia and result in aggressive behavior. Additionally, Clancy testified that when a cocaine high "starts to wear off," a person could experience "a craving or an obsession, a need for more drug," which could "override common sense." She opined that people will "do things they wouldn't normally do" to satisfy "withdrawal and the craving."

¶ 36    On cross-examination, Clancy acknowledged that she did not know anything about defendant's case and had no knowledge of the underlying events. Further, she agreed that substance abusers would lie to get out of trouble and were good at manipulation.

¶ 37    The record reflects the trial court allowed defendant's request to have the jury instructed regarding the lesser offenses of second-degree murder and involuntary manslaughter. The jury was also given a self-defense instruction, which stated as follows:

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the

- 13 -

imminent use of unlawful force.

> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

¶ 38 Ultimately, the jury found defendant guilty of first-degree murder based on counts I and II, but not guilty of premeditated first-degree murder as alleged in count III. In February 2020, defendant filed a posttrial motion for an acquittal or a new trial. Relevant to this appeal, he argued (1) the trial court erred by allowing the State's motion *in limine* to admit testimony from Griffin under the excited utterance exception to the hearsay rule, (2) the court erred by denying his motion *in limine* to bar the State from calling Smith as a witness, (3) the State improperly argued facts not supported by the evidence during its rebuttal closing argument, and (4) the evidence was insufficient to support the jury's findings of his guilt. In March 2020, the court denied defendant's posttrial motion and sentenced him to 52 years in prison. In April 2020, defendant filed a motion to reconsider his sentence, which the court also denied.

¶ 39 This appeal followed.

¶ 40 II. ANALYSIS

¶ 41 A. Ineffective Assistance of Counsel

¶ 42 On appeal, defendant first argues his trial counsel, Stephanie Corum, provided ineffective assistance. Specifically, he complains that Corum improperly failed to (1) advance the defense of the right to use deadly force to prevent a forcible felony, (2) object to the State's elicitation of improper opinion testimony regarding his credibility from its police witnesses, and (3) request a jury instruction on the import of expert witness testimony.

- 14 -

¶ 43        Ineffective-assistance-of-counsel claims are evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), requiring a defendant to establish both that (1) his "counsel's performance fell below an objective standard of reasonableness" and (2) "a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Gayden*, 2020 IL 123505, ¶ 27, 161 N.E.3d 911. "The failure to establish either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *Id.*

¶ 44        To establish deficient performance under the first *Strickland* prong, "the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *People v. Perry*, 224 Ill. 2d 312, 341-42, 864 N.E.2d 196, 214 (2007). "[G]enerally, trial strategy encompasses decisions such as what matters to object to and when to object." (Internal quotation marks omitted.) *People v. Jackson*, 2020 IL 124112, ¶ 106, 162 N.E.3d 223. "[A] mistake in trial strategy or an error in judgment by defense counsel will not alone render representation constitutionally defective." *People v. Peterson*, 2017 IL 120331, ¶ 80, 106 N.E.3d 944. Instead, "[o]nly if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found." (Internal quotation marks omitted.) *Id.* Further, under the second *Strickland* prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." (Internal quotation marks omitted.) *Id.* ¶ 79.

¶ 45                    1. *Force-to-Prevent-a-Forcible-Felony Defense*

¶ 46        As indicated, defendant initially argues Corum was ineffective for failing "to present the defense of the right to use deadly force against the forcible felony of sexual assault."

He contends the underlying circumstances supported such a defense and Corum erred by failing to both argue that defense and request the appropriate jury instruction.

¶ 47    Section 7-1(a) of the Criminal Code of 2012 (Code) (720 ILCS 5/7-1(a) (West 2018)) provides that a person "is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." Further, under the Code, criminal sexual assault is a forcible felony (*id.* § 2-8) and is committed when a "person commits an act of sexual penetration and *** uses force or threat of force" (*id.* § 11-1.20(a)(1)).

¶ 48    In a homicide case, a self-defense instruction should be given to the jury when "there is some evidence in the record which, if believed by a jury, would support a claim of self-defense." *People v. Everette*, 141 Ill. 2d 147, 157, 565 N.E.2d 1295, 1299 (1990). Consistent with the above principles, Illinois Pattern Jury Instructions, Criminal, No. 24-25.06 (approved Oct. 26, 2018) (hereinafter, IPI Criminal No. 24-25.06), entitled "Use Of Force In Defense Of A Person," provides as follows:

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend [(himself) (another)] against the imminent use of unlawful force.
>
> [However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent [(imminent death or great bodily harm to [(himself) (another)]) (the commission of ____)].]"

The Committee Note to IPI Criminal No. 24-25.06 further states as follows:

> "Use the bracketed paragraph when there is some evidence that the force
>
> used by the defendant was likely to cause death or great bodily harm. [Citations.]
>
> Give this instruction when the issue is properly one for the jury. ***
>
> When applicable, insert in the blank the forcible felony.
>
> Use applicable bracketed material." IPI Criminal No. 24-25.06, Committee
>
> Note.

¶ 49       Here, we agree with defendant's assertion that a self-defense jury instruction based upon the prevention of a forcible felony, namely sexual assault, was applicable under the circumstances. At trial, defendant acknowledged shooting Currie but maintained the shooting occurred after he rebuffed Currie's sexual advances and a physical altercation ensued. Specifically, defendant testified Currie made sexual comments to him, exposed his penis, and then grabbed defendant as he tried to leave the apartment, stating, "you suck my d***." Defendant further asserted that Currie "grabbed [his] d***," the two "wrestled," and Currie "charged at [him]." Upon questioning by Corum, defendant testified he feared Currie, who the evidence showed was much larger than defendant, was going to overpower and "rape" him.

¶ 50       However, although we agree that some evidence supported instructing the jury on the theory of self-defense to prevent the commission of a forcible felony, we do not find Corum was ineffective for failing to request that specific instruction. The record shows Corum presented a theory of defense that defendant shot Currie in self-defense during a physical confrontation because he believed "he was about to be raped." She presented that theory during her opening statement and elicited testimony from defendant to support that theory, including defendant's

assertion that, at the time of the shooting, he feared Currie would overpower and "rape" him. During her closing argument, Corum maintained the evidence showed defendant was justified in the use of force if he "reasonably believe[d] that such force [was] necessary to prevent imminent death or great bodily harm to himself." She noted Currie exposed himself and grabbed defendant "to possibly want to do one of those acts that he had talked about, those sexual acts" or to prevent defendant "from running out and telling everybody outside what just happened in the apartment." Finally, the record reflects the jury was instructed regarding self-defense based on the justifiable use of deadly force to prevent imminent death or great bodily harm.

¶ 51　　　　Initially, we find the record indicates Corum's failure to request a forcible-felony, self-defense instruction was a matter of sound trial strategy. Corum's arguments to the jury focused on both a threatened sexual assault and, more generally, a physical attack initiated by Currie. We find a threatened sexual assault was supported by only slight evidence; however, a physical altercation involving the two men was supported not only by defendant's testimony but also evidence of an "area of disturbance" in the apartment. Under the circumstances presented, it was not objectively unreasonable for Corum to elect to present a self-defense theory based more broadly on the threat of death or great bodily harm rather than one that was based on the threat of a sexual assault.

¶ 52　　　　Additionally, even assuming that Corum's performance was deficient, "[a] trial court's failure to instruct the jury on a self-defense theory based on the prevention of a forcible felony may be harmless if the trial court instructed the jury on similar defense theories." *People v. Jackson*, 304 Ill. App. 3d 883, 891-92, 711 N.E.2d 360, 367 (1999). In *Jackson*, the defendant appealed his murder convictions, arguing the trial court erred by refusing to instruct the jury "on

- 18 -

the justifiable use of deadly force to prevent the forcible felony of criminal sexual assault." *Id.* at 889. The First District rejected the defendant's claim, finding, in part, that any error was harmless. *Id.* at 892. The court reasoned as follows:

> "[T]he [trial] court here rejected the defense request for a prevention-of-forcible-felony instruction, but it instructed the jury on a self-defense theory based on the justifiable use of deadly force to prevent imminent death or great bodily harm. In closing arguments, defense counsel argued that [the] defendant was justified in using force against the victim because of the victim's sexual advances. Therefore, the jury had ample opportunity to consider [the] defendant's theory of defense. When the jury rejected [the] defendant's self-defense claim, the jury considered the same evidence necessary to determine if [the] defendant acted reasonably in defending himself against an act of criminal sexual assault. [Citation.] Thus, because the jury was instructed on the theory of defense based on the justifiable use of deadly force and sufficiently considered [the] defendant's self-defense theory, any error was harmless. [Citation.]" *Id.*

¶ 53    This case is similar to the facts in *Jackson*. As set forth above, Corum presented a theory of defense that defendant shot Currie in self-defense during a physical confrontation because he believed "he was about to be raped." Also, the jury was instructed on a self-defense theory based on the justifiable use of deadly force to prevent imminent death or great bodily harm. Thus, for the same reasons set forth in *Jackson*, we find any error in failing to instruct the jury with the forcible-felony, self-defense instruction was harmless. Because any error was harmless, defendant cannot show prejudice as required under the second *Strickland* prong. Accordingly, he

- 19 -

has failed to establish Corum's ineffectiveness on this asserted basis.

¶ 54                                    2. *Police Officer Opinion Testimony*

¶ 55          Defendant next argues Corum was ineffective for failing to object to portions of the State's examination of Hesse and Taylor. He contends Corum erroneously allowed the State to elicit improper opinion testimony from those witnesses regarding his credibility and the legal definition of "rape."

¶ 56          "Under Illinois law, it is generally improper to ask one witness to comment directly on the credibility of another witness [citations] as [q]uestions of credibility are to be resolved by the trier of fact." (Internal quotation marks omitted.) *People v. Becker*, 239 Ill. 2d 215, 236, 940 N.E.2d 1131, 1143 (2010); see also *People v. Henderson*, 394 Ill. App. 3d 747, 754, 915 N.E.2d 473, 478 (2009) (stating it is a "fundamental rule that one witness should not be allowed to express his opinion as to another witness's credibility"); *People v. Jackson*, 2013 IL App (3d) 120205, ¶¶ 21-22, 2 N.E.3d 374 (finding an officer's characterization of the defendant's initial statement during a police interview as a lie was improper opinion testimony that was erroneously admitted at his trial). Further, Illinois Rule of Evidence 701 (eff. Jan. 1, 2011) provides that lay witness testimony "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge."

¶ 57          Initially, we note defendant challenges, in part, testimony from Hesse that set forth a *past* opinion of defendant's truthfulness. Defendant argues that Hesse was improperly allowed to testify that he did not believe defendant during his recorded interview and references the

following colloquy between the State and Hesse:

"Q. During the interview, did you lie to the defendant?

A. I did.

Q. What did you lie to him about?

A. I believe I told him at one point that I believed him [100%] in what he was telling me. ***

Q. Did you believe the defendant [100%]?

A. No."

However, "statements of past opinions, rather than present ones, do not constitute improper lay opinion testimony." *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 58, 103 N.E.3d 1096 (citing *People v. Hanson*, 238 Ill. 2d 74, 101, 939 N.E.2d 238, 254 (2010)); see also *People v. Martin*, 2017 IL App (4th) 150021, ¶ 32, 80 N.E.3d 94 (holding a police officer's "testimony was not an improper lay opinion because it was not offered as a present opinion on [the] defendant's credibility but, rather, was a statement of past belief offered to explain the course of investigation"). Hesse's testimony in this specific instance reflects his assertion of a belief he held at the time of defendant's police interview. Thus, it constitutes testimony regarding a past, rather than present, opinion of the witness and was not improper lay opinion testimony.

¶ 58         With respect to defendant's remaining claims of improper opinion testimony from Hesse and Taylor, we agree that error occurred. First, defendant points out that the State elicited testimony from Hesse that, during his police interview, defendant "wouldn't answer or wouldn't speak to us if he was asked a question that he didn't necessarily want to answer." Hesse followed that statement with the opinion that when a suspect tries to "control the narrative *** or only

- 21 -

answer questions that they want to answer," it suggested that "they don't want other facts to come in; they only want their side told." Defendant also notes that the State elicited testimony from Taylor that, during the police interview, defendant "was evasive," "was stone-walling," and "would just flat-out lie," stating he based those determinations on defendant's refusal to answer simple questions and his body language. The State questioned Taylor regarding what he found "suspect" about defendant's story, eliciting testimony from Taylor that defendant "wanted us to believe that he fought this guy, but he didn't have any injuries." Further, Taylor also opined that after being confronted with certain information, defendant "opened up" and "realized *** it's time to be honest."

¶ 59        In *Henderson*, 394 Ill. App. 3d at 749-51, a law enforcement officer was allowed to testify that the defendant's vague answers and body language during his police interview indicated he was being deceptive. On review, this court held such evidence was improper and amounted to "nothing more than inadmissible opinion testimony by the officer that [the] defendant's story was not true." *Id.* at 753. We further stated as follows:

> "[The officer's] testimony regarding [the] defendant's body language was useless in the determination of guilt or innocence. An investigator's testimony should be presented only to communicate what was said during an interrogation. Using such a witness as a 'human lie detector' goes against the fundamental rule that one witness should not be allowed to express his opinion as to another witness's credibility." *Id.* at 753-54.

¶ 60        Although not as egregious as what occurred in *Henderson*, the above statements from Hesse and Taylor amounted to improper, presently held opinions on the meaning behind

- 22 -

defendant's actions and his lack of truthfulness during the police interview. Their opinions invaded the province of the jury, served no legitimate purpose, and should not have been admitted.

¶ 61        On appeal, defendant also challenges testimony from Taylor, which he contends amounted to an improper legal conclusion that incorrectly defined "rape" for the jury. Defendant references the following colloquy between the State and Taylor:

"Q. What was that single sexual request that [defendant] said [Currie] did?

A. He continually told us that *** Currie offered him $35 in order for [Currie] to, quote, suck his d***, end quote."

Q. Is offering to suck someone's d***, and I apologize for the language, but is offering to do a sexual favor rape?

A. No."

¶ 62        As argued by defendant, "a lay witness should not be permitted to testify to a legal conclusion." *People v. Richardson*, 2013 IL App (2d) 120119, ¶ 10, 995 N.E.2d 477. We agree that the State's question in this instance elicited a legal conclusion from Taylor regarding whether a specific act constitutes a sexual assault and find it was improper.

¶ 63        Here, although we agree that the State elicited improper opinion testimony from Hesse and Taylor, we, again, find defendant is unable to establish prejudice as required under the second *Strickland* prong. At trial, persuasive evidence of defendant's guilt was presented. The State's evidence showed defendant became enraged after Currie made non-threatening sexual comments to him and he retrieved a gun. He later shot Currie in his mother's apartment and then fled the scene. Although defendant maintained he shot Currie in self-defense, his versions of the events, as presented through his recorded police interview and trial testimony, contained

- 23 -

significant inconsistencies regarding Currie's actions and comments prior to the shooting, as well as the circumstances of the shooting itself.

¶ 64        Moreover, the record reflects the jury had the opportunity to view defendant's recorded police interview and could judge his demeanor and actions for themselves. As stated in *Henderson*, when improper testimony "consists of nothing more than another person's opinion regarding truthfulness, the prejudicial impact is reduced significantly[.]" *Id.* at 753. This is so because "the traditional function of the jury is to judge witness credibility," and, in all criminal cases, the jury is so instructed. *Id.* In this case, the jury was properly instructed as to its function as the judge of witness credibility. Because defendant cannot establish *Strickland*-type prejudice, he has failed to establish Corum's ineffectiveness.

¶ 65                    3. *Jury Instruction on Expert Testimony*

¶ 66        The final way in which defendant alleges Corum was ineffective concerns her alleged improper failure to request a jury instruction on the import of expert witness testimony. He notes he presented testimony from Clancy, a certified alcoholism and drug addictions counselor, and argues the jury should have been instructed on the import or relevance of her testimony.

¶ 67        We find no deficient performance by defendant's counsel on this asserted basis. As noted by the State, no instruction is recommended regarding the weight to be given to expert testimony. Illinois Pattern Jury Instructions, Criminal, No. 3.18 (approved Oct. 17, 2014), Committee Note. Further, on appeal, defendant fails to set forth either the contents of any proposed instruction or case authority that would support his position. He argues that without an instruction, "the jury was likely left to think that *** Clancy's role was to reinforce that [defendant] was on drugs, instead of using her testimony to evaluate whether or not his drug use may have influenced

- 24 -

his decisions and actions." However, matters of relevancy and the reasonable inferences to be drawn from witness testimony may properly be addressed through a party's closing argument. Under the circumstances presented, defendant has failed to show that Corum provided ineffective assistance.

¶ 68                                  B. Trial Court's Rulings on Witness Testimony

¶ 69            On appeal, defendant next challenges the trial court's rulings on two of the parties' pretrial motions *in limine*. Specifically, he argues his right to confrontation was violated by the court's denial of his motion to bar the State from presenting Smith as a witness. Defendant also argues the court erred by allowing Griffin to testify to statements made by Smith under the excited utterance exception to the hearsay rule.

¶ 70            "Generally, evidentiary motions, such as motions *in limine*, are directed to the trial court's discretion, and reviewing courts will not disturb a trial court's evidentiary ruling absent an abuse of discretion." (Internal quotation marks omitted.) *People v. Way*, 2017 IL 120023, ¶ 18, 89 N.E.3d 355. An abuse of discretion occurs when the trial court's decision is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *Peterson*, 2017 IL 120331, ¶ 125.

¶ 71                                  1. *Motion to Bar Smith's Testimony*

¶ 72            Defendant argues the trial court erred by denying his request to bar the State from calling Smith as a witness based on her stated intention of invoking her fifth amendment privilege against self-incrimination. He contends the court's ruling, which limited Smith's testimony by compelling her to testify about some matters but not others, prevented him from fully exploring her motivations and intentions, violating his sixth amendment right to confrontation.

- 25 -

¶ 73          "The fifth amendment provides, in part: 'No person *** shall be compelled in any criminal case to be a witness against himself ***.' " *People v. Redd*, 135 Ill. 2d 252, 303, 553 N.E.2d 316, 338-39 (1990) (quoting U.S. Const., amend. V). Thus, "[a] witness in a criminal case has the privilege to refuse to answer questions which tend to incriminate him." *Id.* at 304.

¶ 74          "The protection secured by the fifth amendment is confined, however, to those instances where the witness has reasonable cause to believe he might subject himself to prosecution if he answers." *Id.* A witness may not invoke the privilege "when it is perfectly clear, considering all the circumstances, that the answer sought cannot possibly have a tendency to incriminate." *People v. Edgeston*, 157 Ill. 2d 201, 221, 623 N.E.2d 329, 339 (1993). "Additionally, the right must not be extended to cover imaginary dangers and must not *** be permitted to be used solely for the purpose of protecting a third party from prosecution." *People v. Cooper*, 202 Ill. App. 3d 336, 342, 559 N.E.2d 942, 946 (1990) (citing *People v. Schultz*, 380 Ill. 539, 544, 44 N.E.2d 601, 603-04 (1942)).

¶ 75          "Once a witness asserts his fifth amendment privilege not to incriminate himself, then it is for the circuit court to determine if under the particular facts there is a real danger of incrimination." (Internal quotation marks omitted.) *Redd*, 135 Ill. 2d at 304. The trial court has the discretion to make that determination. *People v. McNeal*, 301 Ill. App. 3d 889, 893, 704 N.E.2d 793, 795-96 (1998).

¶ 76          Here, the record reflects Smith was charged with obstruction of justice based on allegations that she attempted to hide the murder weapon. Prior to trial, she informed the parties of her intention to invoke her privilege against self-incrimination if called as a witness at defendant's trial. Thereafter, defendant filed a motion *in limine* seeking to bar the State from

calling Smith to testify, arguing it would be improper to call her as a witness given her stated intention. Ultimately, the trial court declined to bar Smith as a witness, finding that although she could invoke her fifth amendment privilege regarding matters related to hiding the gun after the shooting, she could testify to other matters that, in the court's view, were not incriminating. At trial, Smith then testified regarding her living situation, her relationship with defendant, defendant's actions and statements prior to the murder, and her observations of defendant immediately after the shooting.

¶ 77 On appeal, defendant does not contend that the trial court abused its discretion by finding Smith could only invoke her fifth amendment privilege with regard to her participation in hiding evidence after the shooting. He presents no reasoned argument that the court erred in finding certain matters would not be incriminating to Smith. Instead, he complains that Smith's limited testimony resulted in a violation of his right to confront witnesses against him. We disagree.

¶ 78 "Under the sixth amendment, a defendant *** has the right to confront witnesses against him." *People v. Evans*, 2016 IL App (3d) 140120, ¶ 44, 60 N.E.3d 77 (citing U.S. Const., amend. VI). "A primary interest of the confrontation clause is the right of cross-examination." *Id.* ¶ 45. Further, "a defendant's claim that his right to confrontation was violated is a question of law subject to a *de novo* review." *Id.* ¶ 28.

¶ 79 To support his assertion of a confrontation-clause violation, defendant primarily relies on *Bruton v. United States*, 391 U.S. 123 (1968). There, the defendant and his codefendant, Evans, were tried jointly for the same crime. *Id.* at 124. Evidence that Evans orally confessed to committing the crime with the defendant was admitted against Evans at the trial; however, the jury was instructed that such evidence could not be considered to determine the defendant's guilt or

innocence. *Id.* at 124-25. The Supreme Court reversed the defendant's conviction, holding there was a "substantial risk" that despite receiving instructions to disregard the confession, the jury "looked to the incriminating extrajudicial statements in determining [the defendant's] guilt." *Id.* at 126. It found that "admission of Evans' confession in [a] joint trial violated [the defendant's] right of cross-examination" under the confrontation clause. *Id.*

¶ 80       We find *Bruton* easily distinguishable from the present case. Unlike in *Bruton*, this case does not present a joint trial of codefendants charged with the same offense or the admission of an accused's extrajudicial confession, implicating his non-confessing codefendant. Here, Smith testified at defendant's trial regarding matters other than her alleged after-the-fact participation in hiding evidence. She never invoked her privilege against self-incrimination in front of the jury and defendant was able to cross-examine her on all matters of which she testified. Under the facts of this case, *Bruton* provides no basis for finding a confrontation clause violation or reversing the trial court's ruling on defendant's motion *in limine*.

¶ 81       Further, to the extent defendant complains about improper inferences from "Smith's testimony regarding her obstruction charge," we note that specific testimony was elicited during defendant's cross-examination of Smith. Specifically, on questioning by defense counsel, Smith agreed that she had been "accused of taking a gun to [Jones's] house" and charged with a felony offense in connection with that accusation. Because this testimony was elicited by defendant, he cannot challenge it as prejudicial to him on appeal. See *People v. Harvey*, 211 Ill. 2d 368, 386, 813 N.E.2d 181, 192 (2004) ("Illinois courts have applied the invited error doctrine in numerous cases to bar a defendant from claiming error in the admission of improper evidence where the admission was procured or invited by the defendant.").

¶ 82                                    2. *Excited Utterance Exception*

¶ 83          As indicated, defendant also challenges the trial court's grant of the State's motion

to allow Griffin to testify to statements Smith made prior to the murder on the basis that they were

excited utterances. He argues Smith's statements did not qualify as such because evidence at trial

indicated they were not made in response to a startling event, there was not "an absence of time"

for fabrication between the alleged startling event and when her statements were made, and her

statements did not relate to the alleged startling event.

¶ 84          " 'Hearsay' is a statement, other than one made by the declarant while testifying at

the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid.

801(c) (eff. Oct. 15, 2015). Generally, hearsay is not admissible. Ill. R. Evid. 802 (eff. Jan. 1,

2011). However, there are various exceptions to the hearsay rule, including one for excited

utterances. Ill. R. Evid. 803(2) (eff. Sept. 28, 2018).

¶ 85          An excited utterance is "[a] statement relating to a startling event or condition made

while the declarant was under the stress of excitement caused by the event or condition." *Id.* For a

hearsay statement to be admissible as an excited utterance, a court must find (1) there has been "an

occurrence sufficiently startling to produce a spontaneous and unreflecting statement," (2) there

was "an absence of time for the declarant to fabricate the statement," and (3) the statement

"relate[s] to the circumstances of the occurrence." *People v. Sutton*, 233 Ill. 2d 89, 107, 908 N.E.2d

50, 62 (2009). The supreme court has set forth the following rationale for the exception:

    "The admissibility of [an excited utterance] is based on our experience that, under

    certain external circumstances of physical or mental shock, a stress of nervous

    excitement may be produced in a spectator which stills the reflective faculties and

removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, rather than reason and reflection, and during the brief period when consideration of self-interest could not have been fully brought to bear, the utterance may be taken as expressing the real belief of the speaker as to the facts just observed by him." (Internal quotation marks omitted.) *People v. Damen*, 28 Ill. 2d 464, 471, 193 N.E.2d 25, 29 (1963).

¶ 86 "When analyzing whether a hearsay statement is admissible as an excited utterance, courts should consider the totality of the circumstances." *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 31, 170 N.E.3d 142. "The totality of the circumstances analysis involves consideration of several factors, including time, the mental and physical condition of the declarant, the nature of the event, and the presence or absence of self-interest." *Sutton*, 233 Ill. 2d at 107.

¶ 87 "The period of time that may pass without affecting the admissibility of a statement [as an excited utterance] varies greatly." *Id.* However, the critical inquiry "is whether the statement was made while the excitement of the event predominated." (Internal quotation marks omitted.) *Id.* at 107-08; see also *People v. Connolly*, 406 Ill. App. 3d 1022, 1025, 942 N.E.2d 71, 76 (2011) ("While the amount of time necessary for fabrication may vary greatly, the critical inquiry with regard to time is whether the statement was made while the declarant was still affected by the excitement of the event."). The fact that a statement is volunteered supports admissibility. *People v. Williams*, 193 Ill. 2d 306, 353, 739 N.E.2d 455, 480 (2000). Further, "spontaneity is not necessarily destroyed by either the fact that a declarant's statement is made after having spoken

previously to another or the fact that a statement was made in response to a question." *Kinnerson*, 2020 IL App (4th) 170650, ¶ 32 (citing *Williams*, 193 Ill. 2d at 352-53).

¶ 88        At trial, Griffin was permitted to testify that around 10 p.m. on May 16, 2019, Smith came to her apartment "and said she was worried that [defendant] was going to get into a fight" and that he "was in a rage." According to Griffin, Smith stated she was going to call defendant and left. Griffin also acknowledged reporting to the police that Smith returned to her apartment at 12:30 a.m., stating " 'he's in a rage and I couldn't stop him.' " Smith further stated that she was scared, and that defendant went " 'shooting out the door.' "

¶ 89        During her own testimony, Smith acknowledged that prior to the murder, defendant was "upset" by someone sexually propositioning him. However, she denied that she was worried about defendant, that he was in a "rage," or that she tried to calm him down. When questioned about her prior statements to the police, Smith acknowledged that she previously reported defendant was "really upset" by someone making a sexual comment to him, that she was worried about defendant, and that she reached out to Griffin for help after she "tried to get [defendant] to settle down and couldn't." Further, in providing his statement to the police, defendant acknowledged being angry or "pissed" about sexual comments Currie made to him. At trial he testified that he informed Smith about Currie's comments and stated he "grabbed a gun" before leaving her apartment.

¶ 90        Here, the record supports the finding that defendant had an angry outburst at Smith's apartment following sexual comments made to him by Currie and that he could not be calmed down by Smith. Evidence showed Smith was "worried" about defendant and voluntarily reached out to Griffin for help. Under the circumstances, the trial court's determination that such

an outburst qualified as a startling event and could produce for Smith the "stress of nervous excitement" was not arbitrary, fanciful, or unreasonable. Thus, it was not an abuse of the court's significant discretion in determining the admissibility of evidence. See *People v. Robinson*, 379 Ill. App. 3d 679, 682, 883 N.E.2d 529, 532 (2008) (finding the defendant's "violent outburst" qualified "as a startling occurrence for purposes of the excited utterance exception" and "[t]he trial court could reasonably conclude that the outburst was sufficient to produce a stress of nervous excitement that would inhibit [the declarant's] reflective faculties" (internal quotation marks omitted)).

¶ 91　　　　　Further, the events at issue occurred within a relatively short time frame and even if Smith spoke to others before seeking Griffin out, such does not necessarily destroy the spontaneity of her voluntary statements to Griffin or indicate there was time for fabrication. Also, the statements to which Griffin testified clearly concern the event at issue—defendant becoming upset and unable to "settle down" after someone made unwanted sexual comments to him. Accordingly, we find no abuse of discretion by the trial court in granting the State's motion and allowing Griffin to testify to Smith's statements.

¶ 92　　　　　　　　　　　C. Sufficiency of the Evidence

¶ 93　　　　　On appeal, defendant further challenges the sufficiency of the evidence against him. Specifically, he contends the State failed to prove beyond a reasonable doubt that his use of force was not justified. We note that in challenging the sufficiency of the evidence, defendant complains that errors in his case—including that the jury was not properly instructed on his self-defense theory and that Taylor incorrectly opined on the definition of "rape" for the jury—"significantly impacted the jury's ability to make decisions of fact in [his] case." However, for the reasons

- 32 -

already stated, to the extent that any error occurred, defendant did not suffer prejudice sufficient to warrant relief.

¶ 94　　　　Further, the appropriate standard when considering a challenge to the sufficiency of the evidence requires that a reviewing court "determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 2020 IL 124112, ¶ 64. "A criminal conviction will not be set aside on a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Id.*

¶ 95　　　　"A person acts in self-defense when (1) the person is threatened with unlawful force, (2) the person threatened is not the aggressor, (3) the danger of harm is imminent, and (4) the use of force is necessary." *People v. Brown*, 406 Ill. App. 3d 1068, 1081, 952 N.E.2d 32, 43 (2011). "It is the State's burden to prove beyond a reasonable doubt that defendant did not act in self-defense." *Id.* Further, "[t]he trier of fact remains responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts," and "[t]he reviewing court does not retry the defendant." *People v. Harris*, 2018 IL 121932, ¶ 26, 120 N.E.3d 900. Ultimately, "a jury has discretion to reject a self-defense claim based on the probability or improbability of [the] defendant's account, the circumstances of the crime, the testimony of the witnesses, and witness credibility." *Brown*, 406 Ill. App. 3d at 1081.

¶ 96　　　　Here, the State's evidence was sufficient to establish defendant's guilt. Again, the evidence indicated defendant was angered and in a "rage" after Currie made non-threatening sexual comments to him. He armed himself with a gun and later shot Currie in his mother's apartment. After the shooting, defendant fled the scene. The murder weapon was found hidden in

- 33 -

bag at another apartment in the complex. Moreover, defendant's assertions of self-defense were, at times, vague and inconsistent. During his police interview, defendant clearly asserted he feared being "raped" by Currie. However, he also stated he was angry or "pissed" about the sexual comments Currie made to him. Further, when pressed on the details of the shooting, defendant refused to answer questions and could not recall significant details, including where he had the gun on his person, where Currie was when he was shot, and what Currie was doing at the time of the shooting. Ultimately, defendant provided inconsistent statements and testimony regarding what sexual comments Currie made to him, when those sexual comments occurred, how many times Currie exposed his penis to defendant, where Currie was when he was shot, and what Currie was doing at the time of the shooting.

¶ 97        Given the inconsistencies in defendant's statements to the police and his trial testimony, the jury was fully warranted in rejecting his claims. Under the facts presented, we find defendant's challenge to the sufficiency of the evidence is without merit.

¶ 98                                    D. Prosecutorial Errors

¶ 99        Defendant further argues that errors by the prosecutor denied him his right to due process and a fair trial. Specifically, defendant reiterates his claims that the prosecutor improperly elicited the opinions of police witnesses on his credibility and the definition of "rape." Further, he argues that the prosecutor improperly stated facts not in evidence during his rebuttal closing argument. Defendant acknowledges that these issues were not properly preserved for review but maintains they may be addressed under the plain error doctrine because clear or obvious error occurred and the evidence was closely balanced.

¶ 100        "To preserve a purported error for consideration by a reviewing court, a defendant

must object to the error at trial and raise the error in a posttrial motion." *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. The failure to take either step results in forfeiture. *Id.* However, a defendant's forfeiture may be excused under the plain-error doctrine when "a clear or obvious error occurred" and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id.* "The initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial." *Id.* ¶ 49.

¶ 101                                    1. *Police Officer Opinion Testimony*

¶ 102        As previously addressed, we agree with defendant that the State elicited improper opinion testimony from Hesse and Taylor. However, for the reasons already discussed, the errors were not so prejudicial as to require relief, and we find the evidence at defendant's trial was not closely balanced. Accordingly, he cannot establish the occurrence of plain error.

¶ 103                                    2. *Prosecutor's Closing Argument*

¶ 104        Defendant next argues the prosecutor committed reversible error by presenting an argument that was not supported by the evidence at trial. Specifically, he contends the prosecutor erred by asserting that blood on defendant's shirt was caused by "blowback" from when he shot Currie. Defendant maintains he was prejudiced by the prosecutor's argument because "blowback" evidence "is often used during trial to indicate that the crime was committed at close range." He maintains such evidence has a "negative connotation" and is indicative of an "intentional" shooting.

- 35 -

¶ 105 "[P]rosecutors are generally accorded wide latitude in the content of their closing arguments." *People v. Runge*, 234 Ill. 2d 68, 142, 917 N.E.2d 940, 982 (2009). "They may comment on the evidence and on any fair and reasonable inference the evidence may yield." *Id.* "Reviewing courts will consider the closing argument as a whole, rather than focusing on selected phrases or remarks, and will find reversible error only if the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error." *Id.*

¶ 106 Here, during his rebuttal closing argument the prosecutor stated as follows:

"Currie's blood was on the defendant's T-shirt. We know that because you heard that from [the State's forensic experts] and the defendant himself this morning when he testified. Whose blood was on the T-shirt? Well, it was [Currie's]. How did that blood or that [deoxyribonucleic acid (DNA)] get on [Currie's] T-shirt and on the gun? Blow-back. He was shot at close range ***, poof, the blood came, splattered onto the gun and onto the T-shirt."

¶ 107 Although defendant asserts no evidence supported the prosecutor's comments, we note the evidence at trial showed there was blood found on the T-shirt defendant was wearing at the time of the murder and that Currie's DNA was found on the gun. Additionally, defense counsel elicited testimony from State witnesses that a black spot on the shirt Currie was wearing at the time of the murder could indicate "stippling" and that "stippling" was "a gunpowder burn *** from a fairly close[-]range firing point." Accordingly, although the word "blowback" may not have been uttered at defendant's trial, the prosecutor's comments regarding a close-range shooting did have an evidentiary basis. Also, that the shooting occurred at a close range was not necessarily

- 36 -

inconsistent with defendant's theory of self-defense, which involved a physical confrontation with Currie in a confined area of Currie's mother's apartment. Under the circumstances presented, we find no error.

¶ 108                                      E. Cumulative Error

¶ 109          Finally, on appeal, defendant argues that the errors during his trial, when taken cumulatively, denied him due process and his right to a fair trial.

¶ 110          Where individual errors "cast[] doubt upon the reliability of the judicial process," a court may find that, cumulatively, "the errors created a pervasive pattern of unfair prejudice to defendant's case." *People v. Blue*, 189 Ill. 2d 99, 139, 724 N.E.2d 920, 941 (2000). In such circumstances, the defendant's conviction should be reversed, and the matter remanded for a new trial. *Id.* at 140.

¶ 111          Here, many of defendant's claimed errors were not, in fact, error. Additionally, for the reasons expressed, any error that did occur was not unduly prejudicial to defendant. As a result, we find none of his claimed errors, either taken alone or together, warrants reversal and a new trial.

¶ 112                                      III. CONCLUSION

¶ 113          For the reasons stated, we affirm the trial court's judgment.

¶ 114          Affirmed.

- 37 -